In re DISCOVERY ZONE SECURITIES LITIGATION.

No. 94 C 7089.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 27, 1996.

Steven Popuch, Swift, Popuch & Sinclair, Chicago, IL, Michael David Craig, Schiffrin & Craig, Ltd., Buffalo Grove, IL, Mark C. Gardy, Abbey & Ellis, New York City, Robert P. Sugarman, Milberg, Weiss, Bershad, Hynes & Lerach L.L.P., New York City, Robert M. Roseman, Spector & Roseman, P.C., Philadelphia, PA, for plaintiffs Robert Kahn, Randy Stark.

John P. Scotellaro, Maureen W. Kirby, Peter G. Rush, Amy Lamar Ostrander, Bell, Boyd & Lloyd, Chicago, IL, for defendants Robert D. Mitchum, Victor R. Casini, Gerald E. Seegers, John T. McCarthy, Discovery Zone, Donald F. Flynn.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiffs brought this class action securities fraud suit on behalf of all persons who purchased Discovery Zone, Inc. ("DZ") common stock between February 17, 1994 and

September 15, 1995.[1] Under a fraud-on-the-market theory, the complaint charges five DZ senior officers[2] with misleading the investing public by repeatedly overstating DZ's earnings and engaging in a series of fraudulent acts designed to inflate stock prices. Plaintiffs claim that the defendants capitalized on these fraudulent acts by selling their own stock while the price remained artificially high. Shortly after these sales, DZ's share price allegedly began a steady descent, leaving plaintiffs with investments worth far less than they cost.

Plaintiffs' Second Consolidated Amended Class Action Complaint ("Compl."), a product of multiple pleading efforts, unites these allegations in two counts. Count I claims that the defendants violated section 10(b) of the 1934 Securities Exchange Act ("the Act"), 15 U.S.C. § 78j(b), and the SEC's corresponding Rule 10b–5, 17 C.F.R. § 240.10b–5. Count II asserts that the individual defendants are secondarily liable as "controlling persons" under section 20(a) of the Act, 15 U.S.C. § 78t(a).

Pending before this Court is defendants' motion to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b).[3] The motion raises all manner of arguments in attempt to demonstrate that plaintiffs have failed to state a valid securities claim. For the reasons explained below, defendants' motion is granted in part and denied in part.

## RELEVANT FACTS [4]

Discovery Zone is in the business of operating indoor child recreational facilities called "FunCenters." Compl. ¶ 6. During its first few years of operation, DZ grew exponentially from owning just two FunCenters to managing over 100 by the end of 1993. *Id.* ¶ 39. Despite this rapid expansion, the company remained unprofitable. *Id.* ¶ 41. DZ's abiding outlook for FunCenter growth nonetheless enticed investors, who fully subscribed the company's initial public offering in June 1993. *Id.* After going public, DZ continued to expand FunCenter operations both at home and abroad. *Id.* ¶¶ 38–40.

## I. DZ's Accounting Methods

Early in 1994, the company ostensibly began to enjoy some success. In a press release issued February 17, 1994, DZ reported a 205% increase in revenue for fiscal year 1993. *Id.* ¶ 43. Likewise, the company informed the SEC in its 1993 10–K annual report that it had been a profitable year: DZ's stated earnings of over $3 million in 1993 compared favorably to the $4 million loss reported in 1992. *Id.* ¶ 43. Donald F. Flynn, the company's CEO and a defendant in this case, said of these developments that "1993 was an outstanding year for Discovery Zone," rendering DZ "the clear industry leader." *Id.* Increased revenue was allegedly attributed to FunCenter expansion and a number of acquisitions. *Id.* But according to plaintiffs, the profits were a facade. *Id.* ¶ 44.

While the public was told that DZ had made money in 1993, defendants had allegedly manipulated the company's accounting to cover up a $2 million loss. *Id.* ¶¶ 9, 44. Plaintiffs state that to report a profit for the year, defendants improperly deferred and amortized the pre-opening costs associated

1. The class does not include the individual defendants and their immediate families; Blockbuster Entertainment Corporation (DZ's parent), Viacom Inc. (Blockbuster's parent), or any other parent, subsidiary, or affiliate of DZ; DZ officers and directors; any entity in which any excluded person has a controlling interest; and the legal representatives, heirs, successors or assigns of any excluded person.

2. Donald R. Price and James R. Jorgenson, DZ employees originally named as defendants in this action, are hereby dismissed in light of the fact that plaintiffs' Second Consolidated Amended Class Action Complaint no longer mentions them.

3. The motion relates only to the individual defendants. This Court dismissed all claims against Discovery Zone without prejudice on March 26, 1996 as a result of DZ's filing for bankruptcy.

4. When deciding a motion to dismiss, this Court is bound to accept the allegations in the complaint as true. *See Doherty v. City of Chicago,* 75 F.3d 318, 322 (7th Cir.1996). Accordingly, the facts are drawn from plaintiffs' Second Consolidated Amended Class Action Complaint, which supersedes all previous complaints. *Nisbet v. Van Tuyl,* 224 F.2d 66, 71 (7th Cir.1995); *Fry v. UAL Corp.,* 895 F.Supp. 1018, 1048 (N.D.Ill. 1995), *aff'd,* 84 F.3d 936 (7th Cir.1996).

with new FunCenters.[5] *Id.* ¶ 44. Deferring these costs would have been acceptable only if defendants reasonably believed that their expenditure would produce a "probable future economic benefit." *Id.; see* Financial Accounting Standards Board (FASB) Concepts Statement (CON) No. 6. Because DZ was such a new company, it allegedly did not have a sufficient operating history to use as a basis for predicting the gains from pre-opening costs. Compl. ¶ 45; *see* FASB CON No. 6 app. B ("Certain expenditures for ... preoperating activities ... are examples of the kinds of items for which assessments of future economic benefits may be especially uncertain...."). Under these circumstances, plaintiffs claim that this method of accounting was improper, and, in fact, violated Generally Accepted Accounting Principles (GAAP). Compl. ¶¶ 44–45.

Defendants purportedly compounded the GAAP violation by amortizing DZ's pre-opening costs over impermissibly long periods of up to two years. *Id.* ¶ 45. The two-year amortization term not only exceeded DZ's entire operating history at the time, but also allegedly departed from industry standards. *Id.* ¶¶ 7–8, 45. Together, the deferral and amortization practices artificially inflated company earnings, and, in turn, the stock price. *Id.* ¶¶ 9, 46. Instead of expensing pre-opening costs immediately, defendants minimized their impact on revenue by spreading them out over several periods. *Id.* ¶ 46. Had the defendants properly expensed the FunCenter pre-opening costs, DZ would have lost money in 1993, and made far less in future quarters. *Id.* ¶ 9; *see* Diagram A.

### DIAGRAM A

Below are DZ's earnings, reported allegedly in violation of GAAP, for the calendar years 1992 and 1993, and for the first three quarters of 1994. Across from this are the earnings, according to plaintiffs, that DZ should have realized had the defendants complied with GAAP. This diagram appears at paragraph 9 of the complaint.

| | Originally Reported (In violation of GAAP) | Actual (In accordance with GAAP) |
|---|---|---|
| 1992 | ($4,969,095) | ($5,128,393) |
| 1993 | $3,306,251 | ($2,307,749) |
| 1st Q 1994 | $3,486,194 | $2,478,706 |
| 2nd Q 1994 | $3,899,953 | $1,629,822 |
| 3rd Q 1994 | ($16,904,945) | ($21,845,335) |

Plaintiffs contend that the GAAP infractions paved the way for defendants to mislead DZ investors and the market. *Id.* ¶¶ 49, 52, 53. In a number of public announcements, the defendants allegedly created the false impression that DZ was indeed profitable and could legitimately increase both its earnings and size:

- On March 31, 1994, *Reuters*, a financial news service, interviewed DZ's Vice President and Chief Financial Officer, Robert Mitchum. Mitchum (a named defendant) detailed DZ's agenda for expansion, including a plan to open 200 additional FunCenters in 1994. Mitchum also stated that he was comfortable with analysts' 1994 per share earnings estimates, which were six times higher than per share earnings in 1993. He attributed the projected boost to DZ's expansion plans. *Id.* ¶ 48.

- On or about April 7, 1994, DZ filed with the SEC its Annual Report to Shareholders for 1993, accompanied by a letter from Flynn. Flynn's letter stated that "acceptance and expansion of our concept was evidenced by our profitability," and contrasted the 1993 net profits with DZ's 1992 loss. Flynn also told shareholders that DZ had enough capital to fund its development schedule. *Id.* ¶ 51.

- On April 20, 1994, DZ issued a press release over the *PR Newswire*. Reporting first quarter earnings of $3.5 million, Flynn allegedly claimed that the company earned as much in that quarter as it did in all of 1993. He pointed to the

---

**5.** Plaintiffs do not state explicitly that defendants concealed these accounting practices from the public. However, they do allege that defendants hid the pre-opening costs' lack of probable future economic benefit, the amount deferred, and the deferral periods. Compl. ¶ 46. Given that on motions to dismiss the Court must draw all reasonable inferences in favor of the plaintiff, *Doherty*, 75 F.3d at 322, we will make the reasonable inference that plaintiffs were unaware of these accounting practices and their impact until defendants issued a press release on this subject November 9, 1994. *See Compl.* ¶ 74.

domestic and overseas jump in operating FunCenters as the reason for DZ's financial success. *Id.* ¶ 53.

● On May 10, 1994, DZ filed its Form 10–Q for the first quarter of 1994 with the SEC. Signed by Mitchum, the 10–Q reported the same earnings figures as the April 20 press release. *Id.* ¶ 54.

Plaintiffs attack these statements as false and misleading. They claim that when Mitchum gave the March 31 interview to *Reuters,* he knew or was recklessly indifferent to the fact that 1993's earnings were artificially inflated by GAAP violations. *Id.* ¶ 49. Consequently, these figures could not legitimately provide the basis for analysts' projected income increases, or fuel the kind of growth to which Mitchum had publicly committed DZ. *Id.* The Annual Report to Shareholders, along with Flynn's letter, allegedly misrepresented the source of DZ's income as expansion and public acceptance, not improper accounting. *Id.* ¶ 52. The April 20 press release and Form 10–Q were allegedly misleading because they overstated DZ's first quarter earnings. *Id.* ¶¶ 53–54. The press release went even further by falsely attributing first quarter profits to DZ's expansion program. *Id.* ¶ 53.

## II. The Acquisitions

As of June 30, 1994, DZ was significantly behind schedule in meeting FunCenter projections. *Id.* ¶ 56. Opening the number of FunCenters the projections called for by year's end would have caused DZ to post losses. *Id.* In addition, DZ had allegedly decided as of July 1, 1994 to change its accounting practice for pre-opening costs. *Id.* DZ would no longer defer and amortize them, but rather would expense the costs as each new FunCenter opened. *Id.* This accounting change, had it been announced, would have exacerbated DZ's losses. *Id.* So the defendants allegedly chose to conceal the new accounting method and its impact, and decided not to meet projections by opening more FunCenters. *Id.* Instead, DZ attempted to meet its FunCenter target with acquisitions. *Id.* ¶¶ 10, 57.

On July 18, 1994, the company issued a press release revealing its plan to acquire McDonald's Leaps & Bounds, a competitor,

as well as 57 of Blockbuster's Discovery Zone franchises. *Id.* ¶ 57. Many of these facilities were located in the same metropolitan areas as existing FunCenters. *Id.* ¶ 64. According to the release, the acquisitions would "produce a formidable company of enormous value to our customers and our stockholders." *Id.* ¶ 57.

But plaintiffs contend that this statement was false and misleading. *Id.* ¶ 58. First, it concealed that defendants expected a material charge against earnings from operating competing, duplicative businesses. *Id.* Second, the press release omitted the "known trend" that Leaps & Bounds was historically unprofitable. *Id.* Plaintiffs claim that, under these conditions, it was inconceivable that the merger would create "a formidable company of enormous value." *Id.* Lacking the benefit of full information, the market reacted to the merger announcement by increasing DZ's stock price 20%, to $20.25 per share. *Id.* ¶ 59.

Two days later, on July 20, DZ issued another press release reporting increased earnings for the second quarter ending June 30, 1994. *Id.* ¶ 60. The company's second quarter Form 10–Q, filed with the SEC on August 15, was to the same effect. *Id.* ¶ 62. Flynn was quoted in the press release as being "pleased with our consistent gains in earnings and revenue." *Id.* He reiterated that the acquisition had "forged an extremely strong player in the children's and family entertainment markets." *Id.* Again, plaintiffs maintain that these statements and filings were false and misleading. Flynn mentioned nothing about the charges against income resulting from the acquisitions. *Id.* ¶ 61. He omitted Leaps & Bounds' history of losses and their likely adverse impact on DZ's future performance. *Id.* The second quarter figures allegedly remained inflated, as they reflected the original improper method of accounting pre-opening costs. *Id.* And although the defendants had reached a decision to change their practices on July 1, Flynn said nothing about it. *Id.*

The Form 10–Q did indicate that the acquisitions would significantly impact DZ. *Id.*

¶ 63. It noted that many facilities would be "expanded, reconfigured, relocated or combined to more efficiently serve the pertinent customer base." *Id.* ¶ 64. The 10–Q acknowledged that this would necessitate a charge against income in 1994. *Id.* But plaintiffs claim that the message was misleading and left out important information. *Id.* ¶ 65. By this time, the defendants had performed sufficient financial analysis to evaluate the acquisitions' impact. *Id.* They knew, but omitted from the 10–Q, that the charge for closing facilities would be substantial, and that DZ would have to incur a second material charge for duplicative management and administration expenditures. *Id.* This additional charge is alleged to be required by GAAP. *Id.* ¶ 96. While the acquisitions' end result was touted as efficiency, defendants allegedly knew the merger amounted to a financial liability that would negatively affect future operations. *Id.*

The second quarter 10–Q allegedly deceived the public in one other respect: it stated that because DZ needed significant restructuring, "the Company's historical results of operations will not necessarily be indicative of the Company's future results of operations." *Id.* ¶ 63. This announcement made it appear as though the acquisitions would alone be responsible for altering DZ's reported results. *Id.* ¶ 66. But plaintiffs contend that the new accounting method of expensing pre-opening costs, which the defendants had silently implemented over a month earlier, would have a profound effect on stated earnings. *Id.* Earlier financial statements computed in violation of GAAP allegedly lost all utility for investors. *Id.* Absent disclosures on the accounting change and its significance, the 10–Q was misleading. *Id.*

### III. The Insider Sales

On August 1st and 2nd, less than two weeks after DZ announced the acquisitions, defendants Mitchum and Victor Casini, DZ's Vice President, Secretary and General Counsel, sold over 95% of their holdings. *Id.* ¶ 67. Their stock captured on average $19.24 per share, just under the $20.25 price set when the market learned about the acquisitions.

Together, Mitchum and Casini realized proceeds of over $2.5 million on their sales. *Id.*

Defendant Gerald Seegers, the President, Chief Operating Officer, and a director of DZ, along with defendant John McCarthy, also a DZ director, likewise allegedly profited from the price hike in the wake of the acquisitions. *Id.* ¶ 68. From August 11–17, 1994, they collectively unloaded 111,116 shares at prices 27% to 43% higher than they were the day before DZ made the acquisitions public. *Id.* McCarthy received a total of $235,938; Seegers, over $2 million. *Id.* ¶ 110.

### IV. DZ's Slow Decline

By September of 1994, Mitchum and the other defendants had begun to reveal that DZ's once-rapid expansion was slowing. They told analysts on September 9 that the company would open only 60 more FunCenters in 1994, as opposed to the 80–100 originally projected. *Id.* ¶ 71. Plaintiffs maintain that this was the first step in executing a so-called "soft landing" toward revealing the true state of the company. *Id.* Nevertheless, the defendants allegedly continued to hide the change in accounting practice and to obscure the acquisitions' adverse effects on the company. *Id.*

On November 9, 1994, DZ issued a press release summarizing third quarter results. *Id.* ¶ 74. The company reported losses of $16.9 million. *Id.* Included in a statement of operations was a provision for the change in accounting procedure. *Id.* The statement also disclosed a $15.1 million special charge against earnings for FunCenter closings resulting from the acquisitions. *Id.* On this subject, defendant Flynn commented that "[a]s part of our long-term strategy, we wanted to put this charge behind us ...." *Id.* Plaintiffs claim this created the false impression that the closings charge was the only one DZ had to take in connection with the acquisitions; Flynn omitted the need to charge an additional $12.5 million for duplication in administration and management. *Id.* ¶¶ 75, 80. Furthermore, the statement of operations allegedly lead the public to believe, wrongly, that earlier financial reports remained useful despite the accounting change. *Id.*

Following DZ's November 9 press release, its stock declined sharply. *Id.* ¶ 78. DZ closed on November 10 at just $14 per share, trading on record volume. *Id.* Plaintiffs contend that even at this level, the stock price was inflated. *Id.*

On November 21, 1994, DZ filed its third quarter Form 10-Q. *Id.* ¶ 79. The document allegedly misled the public by continuing to herald the acquisitions' advantages and failing to fully disclose their associated charges. *Id.* ¶¶ 79, 80, 81. Plaintiffs state that defendants had "no reasonable basis" for assuring investors that the net result would be positive. *Id.* ¶ 83.

The defendants also publicly touted plans for growth, knowing that, to the contrary, the company needed to scale back expansion to address its negative cash flow and to digest the acquisitions. *Id.* ¶ 82. Flynn, for example, talked of negotiations for a $175 million revolving credit line to facilitate domestic and international expansion. *Id.* ¶ 77. The third quarter 10-Q assured investors that the company was "continuing to pursue its FunCenter development schedule." *Id.* ¶ 82. According to plaintiffs, these statements were misleading. *Id.* ¶ 77. Given the ongoing expenses associated with the acquisitions and the depressing effect that expensing pre-opening costs had on income, DZ could not simultaneously expand and stay profitable. *Id.* ¶¶ 77, 82.

On February 13, 1995, DZ announced its expectations for a disastrous fourth quarter. *Id.* ¶ 90. The company attributed its losses to acquisition-related expenses and fourth quarter pre-opening costs. *Id.* In response to the announcement, DZ common stock dropped the next day to a low of $7.25 per share, closing at $8.125 on extremely high volume. *Id.* The company's 1994 10-K annual report filed March 31 allegedly revealed more: the company needed to restate its figures for 1993 and the first three quarters of 1994 to adjust for the change in accounting procedures. *Id.* ¶ 93.

DZ experienced a tumultuous 1995. On April 18, the *Wall Street Journal* reported that Viacom would replace current DZ management. *Id.* ¶ 98. Defendant Flynn immediately surrendered his daily responsibilities, and five board members were asked to resign by June. *Id.* ¶ 98. On May 3, 1995, however, DZ appeared to reverse course, announcing first quarter earnings of $3.6 million. *Id.* ¶ 100. Three weeks later, defendant Flynn sold over 1.2 million shares of his stock at $6.50 per share. *Id.* ¶¶ 101, 110. But DZ returned to unprofitability in the second quarter, posting a loss of $98 million. *Id.* ¶ 102. On September 21, 1995, DZ allegedly announced that it expected a net loss for 1995 and did not foresee becoming profitable again until 1997. *Id.* ¶ 106.

### V. The Defendants

Plaintiffs allege the following additional facts in support of their claims that the individual defendants committed securities fraud and qualify as Discovery Zone's "controlling persons" under § 20(a) of the 1934 Securities Exchange Act:

Donald Flynn acted as Chairman and CEO of Discovery Zone, and served on its board of directors. *Id.* ¶ 22. By reading internal corporate documents, communicating with other officers, and attending management and board meetings, Flynn allegedly became privy to adverse non-public information about DZ's financial results, accounting manipulations, and present and future business prospects. *Id.* In addition, he allegedly performed due diligence on Leaps & Bounds and the Blockbuster facilities before their acquisition. *Id.* The due diligence investigation apprised him of the entities' unprofitable history and their overlapping operations with existing FunCenters. *Id.* Plaintiffs claim that despite his duty to disclose this material adverse information, Flynn hid it and benefitted by selling his DZ stock at inflated prices. *Id.*

Robert Mitchum, DZ's Vice President and CFO, likewise allegedly knew the adverse undisclosed information about DZ's true financial position, improper accounting methods, and business prospects. *Id.* ¶ 23. He learned these facts through internal company documents, communications with DZ officers and directors, and management meetings and reports. *Id.* Mitchum also participated in the pre-acquisition due diligence investigation, which allegedly revealed the impending

need for charges against earnings resulting from duplicative management and administration. *Id.* Like Flynn, Mitchum had a duty to disclose this information or to refrain from selling his DZ shares at inflated prices. *Id.*

Defendants Casini, Seegers, and McCarthy, all high-level DZ executives and/or directors, were allegedly aware of DZ's accounting manipulations, acquisition burdens, and current and future prospects as well. *Id.* ¶¶ 24–26. They had access to company operating plans, budgets, and forecasts, communicated with other officers and directors at management and board meetings, and participated in or were informed about the results of the acquisition due diligence investigation. *Id.* Plaintiffs state that these documents and communications provided Casini, Seegers and McCarthy with adverse material information that they had a duty to disclose to the public. *Id.* Instead, taking advantage of their insider knowledge, they sold DZ stock from their personal portfolios at inflated prices. *Id.*

Finally, plaintiffs maintain that all the defendants are DZ "controlling persons" for two additional reasons. *Id.* ¶ 27. First, the defendants allegedly controlled the contents of DZ quarterly and annual reports and press releases. Each defendant thus had the opportunity and duty to correct any misinformation in these documents. *Id.* ¶ 28. Second, by reason of their stock ownership, management and directorial positions, the defendants had the power and influence to carry out the allegedly illegal practices that are the subject of this suit. *Id.* ¶ 29.

## VI. The Plaintiffs

The following class representatives are alleged to have bought DZ stock in reliance on the defendants' misrepresentations, and sustained damages when their investments declined substantially in value. *See id.* ¶ 20. Robert Friedman purchased 200 DZ shares at $18.65 per share on March 16, 1994. *Id.* Robert Kahn purchased 300 DZ shares at $20.00 per share on July 19, 1994. *Id.* Randy Stark purchased 100 DZ shares at $17.91 per share on November 10, 1994. *Id.* And Bernard Weisburgh purchased 105 DZ

shares at $12.00 per share on January 17, 1995. *Id.*

## PLEADING STANDARDS

Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) test the legal sufficiency of the complaint, not the merits of the suit. *Triad Assocs., Inc. v. Chicago Housing Auth.,* 892 F.2d 583, 586 (7th Cir.1989), *cert. denied,* 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990). Moreover, in considering motions to dismiss, a court must view all facts alleged in the complaint, as well as all reasonable inferences from those facts, in the light most favorable to the plaintiff. *Doherty,* 75 F.3d at 322; *Gray v. County of Dane,* 854 F.2d 179, 182 (7th Cir.1988). Judges are not to dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim warranting relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *R.E. Davis Chem. Corp. v. Diasonics, Inc.,* 826 F.2d 678, 684–85 (7th Cir.1988).

Plaintiffs' central contention is that the defendants, through various fraudulent actions and public statements, violated SEC Rule 10b–5. To state a claim for securities fraud under this Rule, plaintiffs must plead five separate elements. They must allege that the defendant (1) made a misstatement or omission (2) of a material fact (3) with scienter (the intent to mislead) (4) in connection with the purchase or sale of securities (5) that caused plaintiffs' loss. *Stransky v. Cummins Engine Co.,* 51 F.3d 1329, 1331 (7th Cir.1995); *Schlifke v. Seafirst Corp.,* 866 F.2d 935 (7th Cir.1989). Because fraud is an essential component of a 10b–5 claim, these allegations are subject to the heightened fraud pleading standards set forth in Federal Rule of Civil Procedure 9(b). *Tomera v. Galt,* 511 F.2d 504, 508 (7th Cir.1975); *Reshal Assocs. v. Long Grove Trading Co.,* 754 F.Supp. 1226, 1230 n. 1 (N.D.Ill.1990) (Rovner, J.).

Rule 9(b) requires that all allegations of fraud state the circumstances constituting the fraud with particularity. Fed. R.Civ.P. 9(b). In the Seventh Circuit, this means that a plaintiff must specify the time,

place and contents of the misrepresentations, the identities of the persons making the misrepresentations, and the way in which the misrepresentations were dispatched. *See Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990); *Reshal*, 754 F.Supp. at 1230; *see also DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). Rule 9 must nonetheless be read in conjunction with Rule 8, which requires only that a plaintiff "make known his claims simply and concisely in short, plain statements." *Tomera*, 511 F.2d at 508; *Reshal*, 754 F.Supp. at 1230. A plaintiff need not plead evidence in a complaint. *See Reshal*, 754 F.Supp. at 1230; *Coronet Ins. Co. v. Seyfarth*, 665 F.Supp. 661, 666 (N.D.Ill.1987). In addition, courts must apply Rule 9 keeping in mind its purposes to: (1) provide defendants with fair notice of the plaintiff's claim and enable them to formulate a response; (2) eliminate conclusory complaints used as a pretext for taking discovery to uncover violations; and (3) protect defendants from harm to their reputation. *See Reshal*, 754 F.Supp. at 1230; *Kas v. Caterpillar, Inc.*, 815 F.Supp. 1158, 1162–63 (C.D.Ill.1992) (Mihm, C.J.). With these standards in mind, we move on to consider whether plaintiffs state a claim for securities fraud.

## ANALYSIS

■ Plaintiffs, using a "fraud-on-the-market" theory,[6] allege that the defendants schemed to artificially inflate DZ's stock price and earnings, inducing investors who relied on market integrity to buy into the

company. Knowing that DZ's financial woes would eventually have to be revealed, defendants allegedly sold their stock when the price was highest, just after the acquisitions and just before DZ began expensing preopening costs. Having thus profited, the defendants are said to have begun slowly disclosing the true state of the company. Plaintiffs, lacking this knowledge, could not divest themselves until the information became public, and the market had accordingly adjusted DZ's stock price downward.

Plaintiffs point to four categories of acts to support their fraud claim. They charge that defendants: 1) violated generally accepted accounting principles ("GAAP") to make DZ appear profitable when it was not; 2) obscured the negative fiscal consequences of DZ's acquisitions; 3) concealed knowledge that DZ's expansion plans were financially infeasible; and 4) misrepresented the adverse effects of belatedly changing the company's accounting practices. Defendants respond by attacking each category largely[7] on three grounds: (1) plaintiffs fail to allege any misstatement or omission that made an affirmative statement misleading; (2) plaintiffs do not adequately plead scienter; and (3) plaintiffs do not state the circumstances constituting fraud with particularity as Rule 9(b) requires.[8]

### I. The GAAP Violations and the Change in Accounting Practice

#### A. Plaintiffs Have Sufficiently Pled Omissions and Misstatements

■ The first order of business in pleading securities fraud is establishing that the

---

**6.** In *Kriendler v. Chemical Waste Mgmt., Inc.*, 877 F.Supp. 1140, 1150 n. 8 (N.D.Ill.1995), this Court recognized that the fraud-on-the-market theory has three components. First, it relieves plaintiffs from having to prove individual reliance on a misstatement. The theory presumes that the plaintiffs relied on market integrity to accurately reflect the company's value. *See Basic Inc. v. Levinson*, 485 U.S. 224, 241–42, 108 S.Ct. 978, 988–89, 99 L.Ed.2d 194 (1988). Second, the theory incorporates the efficient market hypothesis, which postulates that the market is open and developed, and immediately "impounds all available information, even knowledge that is difficult to articulate." *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1129 (7th Cir.1993), *cert. denied*, 510 U.S. 1073, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994). When information is disclosed, the market reacts immediately, digesting it and adjusting the stock price accord-

ingly. *Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1419 (7th Cir.1992). Third, plaintiffs are charged with knowing all available information, both misleading and truthful. *Id.*

**7.** Defendants set forth a number of additional arguments that raise factual issues, and, as such, are totally inappropriate for a motion to dismiss. Those issues will be addressed either summarily or not at all. *See In re Chambers Devel. Sec. Litig.*, 848 F.Supp. 602, 619 & n. 8 (W.D.Pa. 1994).

**8.** Defendants do not seriously challenge plaintiffs on the other two elements comprising a securities fraud claim: materiality and loss causation. Consequently, the Court will not discuss those elements.

defendant either made a false statement of material fact, or omitted a material fact that rendered an affirmative statement misleading. *Searls v. Glasser,* 64 F.3d 1061, 1065 (7th Cir.1995); *Lionheart Partners, Inc. v. M–Wave, Inc.,* 923 F.Supp. 1085, 1088 (N.D.Ill.1996). Plaintiffs need not connect a particular misstatement with a particular omission; it is sufficient if any alleged omission makes any identified statement misleading. *Kas,* 815 F.Supp. at 1172.

▮ The defendants argue that plaintiffs allege no misstatement or omission of material fact in connection with DZ's pre-opening cost accounting practices.[9] In fact, they contend, the market was well aware that DZ deferred and amortized pre-opening costs because this practice was supposedly disclosed in a number of 1993–1994 financial statements. Defendants' second line of attack is that their failure to disclose a prospective accounting change for the third quarter of 1994 in DZ's second quarter 10–Q did not make the second quarter report misleading. The decision to change methods was assertedly not even made until the company announced third quarter results on November 9.

Defendants' disclosure argument is easily disposed of. In deciding motions to dismiss, this Court is limited to the allegations in the complaint. As defendants admit, the most recent version of plaintiffs' complaint is devoid of evidence that defendants informed the public before November of 1994 that DZ amortized FunCenter pre-opening costs. This complaint supersedes all prior complaints, including any contrary statements alleged in them. *Nisbet,* 224 F.2d at 71; *Fry,* 895 F.Supp. at 1048. Defendants cannot attempt to refute the complaint or present a different set of allegations on a motion to dismiss. *Gomez v. Illinois State Bd. of Educ.,* 811 F.2d 1030, 1039 (7th Cir.1987). Secondly, market knowledge is generally a question of fact, suitable for determination at a later point in the proceedings. *Schaffer v. Timberland Co.,* 924 F.Supp. 1298, 1309 (D.N.H.1996); *Ballan v. Upjohn Co.,* 814 F.Supp. 1375, 1382–83 (W.D.Mich.1992).

Furthermore, defendants' focus on the factual question of when they decided to expense pre-opening costs misses the point. The issue is not simply whether the defendants made DZ's second quarter report misleading because they neglected to mention that next quarter's results would reflect a different accounting practice. Rather, the problem lies in the fact that every financial statement since DZ went public through the second quarter of 1994 allegedly exaggerated company earnings because they were computed in violation of GAAP. Such an "overstatement of revenues in violation of GAAP can constitute a material misrepresentation that gives rise to an action for securities fraud." *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.,* 927 F.Supp. 1297, 1306 (C.D.Cal.1996).

*Marksman* is instructive. In that case, the plaintiff alleged, under a fraud-on-the-market theory, that he was induced to buy company stock based on the artificially inflated price the market set in response to overstated earnings calculated in violation of GAAP. *Id.* at 1303. The company had alleg-

---

**9.** This argument is preceded by defendants' claim that plaintiffs fail to identify a particular GAAP that prohibits amortizing pre-opening costs. FASB CON No. 6, upon which plaintiffs rely for this proposition, is lambasted as "not GAAP." This Court finds that whether FASB CON No. 6 constitutes a GAAP is best resolved by expert testimony, and thus should not be addressed on a motion to dismiss.

Defendants also devote unnecessary attention to insisting that amortizing pre-opening costs was "appropriate" because it was based on a reasonable belief that the expenditures produced a "probable future economic benefit." *See* FASB CON No. 6. Urging that "DZ and the independent public accountants were right," defendants produce a graph in attempt to demonstrate that,

contrary to the complaint, DZ would still have been profitable in 1994 even if it had expensed pre-opening costs. Again, the merits of amortization versus expensing under these facts is a topic to be explored by accounting experts.

Defendants further test this Court's patience by attaching Walt Disney Company financial statements to their reply brief to show that DZ's industry peers regularly amortize pre-opening costs over long periods. The Court seriously questions whether defendants are familiar with the legal standards applicable to motions to dismiss. Their attempt to place before the Court the merits of their defense at this stage of the litigation is highly improper and a waste of judicial resources.

edly recognized revenues on sales of one of its products earlier than GAAP permitted. *Id.* at 1304. These "stellar sales figures" in turn fueled a stock price increase. *Id.* at 1302. After the company's CEO sold 20% of her stock and the plaintiff purchased his shares at these inflated prices, a financial journal publicly questioned the company's accounting procedures, prompting a quick decline in stock value. *Id.* at 1303, 1313.

The court held that the company's overstated revenues tainted by GAAP violations amounted to a false or misleading statement of material fact necessary to establish a Rule 10b–5 violation. *Id.* at 1305. The complaint alleged that GAAP required the company to wait until it could "reasonably estimate future returns" on sales of this particular product before recognizing revenues. *Id.* The plaintiff set forth a number of reasons explaining why the company could not, in fact, reasonably estimate future returns. *Id.* Since these allegations fit the GAAP criteria, the company's financial statements issued in contravention of those criteria were false and misleading. *Id.*

Like the *Marksman* plaintiff, plaintiffs here point to a specific alleged GAAP, whose violation inflated earnings, and set forth allegations that meet GAAP criteria.[10] FASB CON No. 6[11] permits amortizing pre-opening costs only when their expenditure is reasonably expected to produce a "probable future economic benefit." Given DZ's short operating history, plaintiffs contend that defendants could not possibly predict whether spending this money would probably benefit DZ in the future. For all defendants knew, the Fun-Centers could have (and arguably did) turn out to be a financial flop. Moreover, the alleged GAAP itself explicitly characterizes the gains from pre-opening expenditures as "especially uncertain." FASB CON No. 6 app. B. Accepting plaintiffs' allegations as true on this point, the Court finds that they fit the criteria of the relevant GAAP. As

such, plaintiffs have sufficiently pled that the 1993 10–K and 10–Qs for the first two quarters of 1994, which presented earnings calculated in violation of those criteria, were misleading.

■ . The defendants misled not only by way of financial statements hiding losses through accounting manipulations, but also through inaccurate public statements about the health of the company. Both Flynn and Mitchum openly stated in interviews, press releases and public documents that DZ was profitable in 1993 and the first two quarters of 1994, and attributed the company's success to expansion. But the plaintiffs allege that DZ was not actually profitable during this period, and the reason it appeared to be was not growth, but rather improper accounting. Consequently, Mitchum's interview with *Reuters*, Flynn's April letter to DZ shareholders, and the reports on 1994 first quarter earnings are all sufficiently pled as misleading.

■ Plaintiffs also identify misleading statements made after DZ announced its decision to expense pre-opening costs. While the press release reporting third quarter earnings issued on November 9, 1994 included a provision for the change in accounting procedure, it failed to disclose the dramatic adverse effect on future income. Nor did the company explain that earlier financial statements, prepared under the amortization method, would be rendered useless because they were impossible to compare with statements implementing the new practice. Incomplete disclosures implicate a duty to disclose any additional information needed to rectify the misleading statements. *Schlifke*, 866 F.2d at 944. Even though the release's acknowledgement that DZ had decided to expense pre-opening costs was literally true, the plaintiffs claim that it continued to mislead investors by concealing the resulting negative impact. *See McMahan & Co. v.*

---

10. In addition to pointing out specific alleged GAAP provisions that defendants transgressed, plaintiffs claim that amortizing pre-opening costs over periods that exceeded DZ's history as a company was not an accepted practice within DZ's industry.

11. The Court emphasizes that it is not, at this time, making a factual determination as to whether FASB CON No. 6 constitutes GAAP. Rather, we assume that this is true only for purposes of this motion, and merely analyze whether plaintiffs' factual allegations satisfy the criteria in what they allege to be a GAAP.

*Wherehouse Entertainment, Inc.,* 900 F.2d 576, 579 (2d Cir.1990) ("Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors."), *cert. denied,* 501 U.S. 1249, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991). Not until DZ filed its 10–K annual report for 1994 on March 31, 1995 did defendants reveal the accounting change's full impact by restating earnings reported under the original procedure.

### B. Plaintiffs Have Pled Scienter

■ Scienter, or the intent to defraud, is an essential element of every 10b–5 claim. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). It is sufficiently pled if the complaint "afford[s] a basis for believing that plaintiffs could prove scienter." *DiLeo,* 901 F.2d at 629. Unlike the factual circumstances constituting the fraud, a defendant's fraudulent intent may be averred generally. Fed.R.Civ.P. 9(b); *Reshal,* 754 F.Supp. at 1235.

■ Defendants contend that their timing and selection of accounting methods was a product of business judgment, not fraudulent intent. They cite *DiLeo v. Ernst & Young* for the proposition that "[i]f all that is involved is a dispute about the timing of the [adjustment], we do not have fraud; we may not even have negligence." 901 F.2d at 627. This is to ignore two critical allegations: (1) that defendants violated GAAP; and (2) that defendants took advantage of the violation by selling their own stock at the resulting inflated prices. Both statements provide a basis for inferring that defendants possessed fraudulent intent.

Scienter can be inferred from an allegation that the defendants sold or intended to sell stock from their personal reserves during the class period. *Marksman,* 927 F.Supp. at 1312. For example, in *Marksman,* the court found that the defendant's overstatement of revenues, the consequent rise in stock price, and the CEO's sale of over 20% of her shares at this price raised a "strong inference of scienter." 927 F.Supp. at 1313. In the case before this Court, plaintiffs have similarly alleged that four of the five defendants sold huge amounts of stock (in Mitchum and Casi-ni's case, over 95% of their holdings) when DZ share prices were among their highest, just before DZ disclosed its decision to change accounting methods. The extent of insider selling alleged here easily "afford[s] a basis for believing that plaintiffs could prove scienter." *DiLeo,* 901 F.2d at 629.

Moreover, *DiLeo,* the only Seventh Circuit case on which defendants rely to support their business judgment theory, did not involve charges of insider trading. The plaintiffs in that case "offer[ed] no information other than the differences between the two statements of the firm's condition," and did not point to any facts suggesting that the difference was attributable to fraud. *Id.* at 627–28. Here, in contrast, we are faced with clear allegations that the defendants committed fraud by taking advantage of inflated earnings fueled by a GAAP violation, knowing that a downturn was imminent given the earlier decision to change practices.

Finally, the alleged GAAP violations alone support an inference of fraudulent intent. *Marksman,* 927 F.Supp. at 1313; *Chambers,* 848 F.Supp. at 619–20. Like the defendants in this case, the *Chambers* defendants had allegedly used improper accounting methods to "artificially enhance Chambers' profits, its financial picture and financial projections." *Id.* at 619. Although an intent to defraud was "not the only inference that [could] be drawn from the complaint," it was certainly a permissible one. *Id.* at 620 (internal quotations and citation omitted). Under these circumstances, the complaint "quite plainly allege[d] the requisite scienter." *Id.* at 619.

We find that, based on charges that the defendants committed GAAP violations having the effect of overstating DZ's earnings, and that the defendants profited from this practice by engaging in insider trading, plaintiffs have adequately pled scienter.

### C. Plaintiffs Have Satisfied Rule 9(b)

■ Defendants assert that plaintiffs do not delineate the alleged accounting fraud with particularity, that is, the "who, what, where, when, and how" necessary to plead a

10b–5 violation.[12] *DiLeo,* 901 F.2d at 627. Specifically, defendants criticize plaintiffs for not identifying who at DZ knew that amortizing pre-opening costs violated GAAP, how the conclusion was reached, or when it was made.

Once again, defendants pursue the wrong analysis. Rule 9(b) requires articulation of the time, place and contents of the misrepresentation, the identities of the persons responsible for it, and the manner in which it was made. *Sears,* 912 F.2d at 893; *Reshal,* 754 F.Supp. at 1230. It does not demand details on how the defendants came to their decision to commit fraud.

■■■ Under the correct reading of 9(b), plaintiffs have met their pleading burden for the accounting claims. They identify public records containing the misleading statements: press releases and specific annual and quarterly reports. They describe the misrepresentations by quoting the relevant language from these documents. They put dates on all the alleged misrepresentations. And they identify the communicators: Mitchum, in an interview with *Reuters* and in signing off on SEC filings; and Flynn, in press releases and a letter to DZ shareholders. Finally, by explaining the GAAP violation and demonstrating its impact on earnings, plaintiffs show how defendants brought about the fraud. *See, e.g., Ross v. A.H. Robins Co.,* 607 F.2d 545, 558 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980) (Rule 9(b) met by referring to specific dated documents, such as Form 10–K, press releases, and annual reports, that were claimed to be misleading); *Marksman,* 927 F.Supp. at 1308 (highlighting the precise dates, manner, content and nature of allegedly misleading statements satisfied 9(b)).

Keeping in mind the purposes behind Rule 9(b)—to afford defendants fair notice of the claims against them and to prevent conclusory complaints from hiding frivolous suits—we conclude that plaintiffs have satisfied their burden of pleading fraud with particularity.

The court in *Reshal Associates v. Long Grove Trading Co.* adopted the same practical approach in response to the argument that plaintiffs failed to link specific misrepresentations to specific defendants:

> This is not a case, however, where plaintiffs' failure to be more specific implicates Rule 9(b)'s purposes to any substantial extent. Plaintiffs have provided several concrete examples of alleged misrepresentations, contained in documents attached to the complaint, and one reason for the lack of further specificity may be a desire to avoid overwhelming the complaint with impenetrable and complex details that could be more easily shared during discovery. Although plaintiffs refer to an ongoing pattern of misrepresentations over the course of several years, the number of defendants involved is very limited. Plaintiffs' allegations are not inconsistent or confusing. They do not leave the reader without any basis for inferring that the defendants were involved in the alleged wrongs.

*Id.* at 1231 (citations omitted). Defendants' motion to dismiss the accounting allegations is denied.

## II. The Acquisitions Claim

### A. Plaintiffs Have Pled Misleading Statements

Plaintiffs point to three separate documents whose discussion of the Leaps & Bounds and Blockbuster acquisitions allegedly misled investors. First, the July 18, 1994 press release announcing the acquisitions proclaimed that the combination would "produce a formidable company of enormous value." Second, on July 20, Flynn reiterated in a press release that the merger had "forged an extremely strong player in the children's and family entertainment markets." Third, in DZ's November 9 press release, which revealed a $15.1 million charge against earnings for closings arising from the acquisitions, Flynn remarked that "we wanted to put this charge behind us."

---

12. The defendants point out that plaintiffs have made their substantive allegations "on information and belief." While it is true that this raises their pleading burden to "set[ting] forth the facts on which that information and belief rests," *Kriendler,* 877 F.Supp. at 1149, we believe that plaintiffs' detailed allegations pass this test.

Plaintiffs claim that these statements were rendered misleading because they omitted: (1) the acquired companies' history of losses; and (2) the need to take substantial charges against income. When the company finally disclosed the extent of charges against earnings for closing FunCenters, it left out a $12 million charge required by GAAP for duplicative administration and management. Missing this information, these statements allegedly fostered the illusion that the acquisitions would boost DZ, not drain its resources.

 The acquisitions statements highlighted by plaintiffs are forward-looking. Cases interpreting the 10b–5 requirement of pleading false or misleading statements treat such predictions differently than historical statements. *See, e.g., Stransky,* 51 F.3d at 1333; *Roots Partnership,* 965 F.2d at 1418–19; *Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 513–14 (7th Cir.1989); *Lionheart Partners, Inc.,* 923 F.Supp. at 1088–89; *Kas,* 815 F.Supp. at 1170. Instead of alleging that a statement was false or misleading because it omitted information, allegations concerning forward-looking statements must include specific facts showing: (1) defendants lacked a good faith belief in the statements at the time they were made; or (2) defendants had no reasonable basis for making the statements. *Kas,* 815 F.Supp. at 1170. Predictions are also actionable if the defendant made them while "aware of factual information that would undermine their accuracy." *Lionheart Partners, Inc.,* 923 F.Supp. at 1088. Courts recognize the importance of imposing liability for unreasonable forecasts, since investors rely heavily on these kinds of statements in deciding whether to buy stock: "[i]nvestors value securities because of beliefs about how firms will do tomorrow, not because of how they did yesterday." *Wielgos,* 892 F.2d at 514. The Court will apply the pleading requirements for predictions with this in mind.

 DZ's July 18 and July 20 statements pronouncing that the merger would result in "a formidable company of enormous value" and had "forged an extremely strong player in the children's and family entertainment markets" are predictions about the way in which the defendants expected the acquisi-

tions to affect DZ. Plaintiffs contend that these statements told only half the story— the positive half. Notably absent was the fact that DZ would later need to take substantial charges against income from operating competing, duplicative businesses. Nor was there any mention of the "known" trend of losses tarnishing Leaps & Bounds' operating history. Plaintiffs allege that defendants were aware of this information, obtained while performing due diligence.

The Court finds that plaintiffs have alleged facts sufficient to show that defendants lacked a reasonable basis for making such opulent predictions. Adding the defendants' earlier decision to switch accounting practices, which they knew would serve to deflate earnings, to the acquired companies' history of losses and the impending charges against income, the Court can at least draw the inference that defendants lacked a reasonable basis for thinking that the result would be a "formidable company of enormous value" or a "strong player" in the entertainment industry. At a minimum, plaintiffs have demonstrated that defendants " 'ignore[d] facts seriously undermining the accuracy of the forecast.' " *Lionheart Partners, Inc.,* 923 F.Supp. at 1088 (quoting *Marx v. Computer Sciences Corp.,* 507 F.2d 485, 490 (9th Cir.1974)).

Other courts faced with predictions of financial prosperity in the face of contrary facts have reached the same conclusion. In *Kas v. Caterpillar, Inc.,* the defendants told investors in the company's annual report that "Brazil ···· represents great potential for Caterpillar's future." 815 F.Supp. at 1173. The court found the statement lacked a reasonable basis in light of Brazil's state of economic disruption and its possible detrimental effect on the company's Brazilian operations. *Id.* at 1161, 1173. In *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033 (7th Cir.1977), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 225, 54 L.Ed.2d 155 (1977), one of the defendants projected that the company, SKI, would earn $2.6 to $2.9 million in the coming year. *Id.* at 1040. The court found this prediction unreasonable because the defendant "knew of SKI's production and financial difficulties and of the distinct possibility

of large write-offs having to be made at the end of the year." *Id.*

Plaintiffs further argue that even DZ's statements partially disclosing the negative aspects of the acquisitions, such as the need for charges against income, did not reveal enough to cure their misleading nature. While DZ's November 9, 1994 press release divulged both the closings charge and its amount, $15.1 million, it said nothing about a second $12 million GAAP-mandated charge for duplicative management and administration. In addition, plaintiffs maintain that Flynn cultivated the impression that the closings charge was the only one DZ would have to take in connection with the acquisitions, by emphasizing DZ's desire to "put this charge behind us."

Defendants' response is twofold. First, they argue that the statements regarding charges against income amount to tentative internal estimates, which do not trigger a duty to disclose. *See Wielgos,* 892 F.2d at 516; *Arazie v. Mullane,* 2 F.3d 1456, 1468 (7th Cir.1993). Second, defendants assert that the Court should construe the admittedly ambiguous language about the charges in their favor.

First, we do not accept the defendants' characterization that the omitted statements about charges against earnings were merely "internal estimates" immune from disclosure. Having publicly revealed in the November 9 press release only part of the picture, that is, the need for a closings charge, defendants had "a duty to disclose whatever additional information is necessary to rectify the misleading statements." *Schlifke,* 866 F.2d at 944. Accepting, as we must, the plaintiffs' allegations as true, defendants were required to take a substantial additional charge of $12.1 million for duplicative administrative costs. DZ's press release mentions nothing about this. After a quarter during which DZ sustained a $16 million loss, investors should have been told that the company needed to expend $12 million more. Absent this disclosure, the November 9 press release was misleading.

Second, on motions to dismiss, the Court must interpret ambiguities in favor of the plaintiff. *Dawson v. General Motors Corp.,* 977 F.2d 369, 372 (7th Cir.1992); *Kriendler,* 877 F.Supp. at 1144. It is true that Flynn's November 9 remark about wanting to "put this charge behind us," in juxtaposition with the $15.1 million charge against earnings for closings divulged in the same statement, is not unequivocal evidence that defendants were promising no more charges. The net effect is indeed ambiguous. But viewing this statement in the light most favorable to the plaintiff, the Court finds that it could have misled investors to believe that the closings charge was the only one that DZ would have to incur with respect to the acquisitions.

Moreover, receiving the benefit of this ambiguity, plaintiffs have met the tests for pleading actionable predictions set forth in *Kas* and *Lionheart.* They have alleged facts to support the inference that defendants had no reasonable basis for believing that DZ would absorb only one charge, in the amount of $15.1 million for FunCenter closings, arising from the acquisitions. That GAAP allegedly required a second $12 million charge for duplicative management and administration was a fact "seriously undermining the accuracy" of the $15.1 million projection. *Marx,* 507 F.2d at 490. By failing to disseminate this information, defendants misled investors about the state of DZ's financial affairs.

In short, the Court finds that, with respect to the acquisitions claims, plaintiffs have met their burden of pleading misleading statements.

**B. Plaintiffs Have Established Scienter**

Defendants next argue that timing DZ's write-off for the FunCenter closings in connection with the acquisitions was a matter of business judgment. Plaintiffs are merely "quibbling with the speed at which DZ completed the complex process." Such exercises of business judgment, defendants contend, are not actionable fraud.

This line of argument need not detain us long. It bears repeating that insider trading during the class period supports a "strong inference of scienter." *Marksman,* 927 F.Supp. at 1312; *cf. In re HealthCare Compare Corp.,* 75 F.3d 276, 284 (7th Cir.1996) (no inference of scienter because "plaintiffs do not allege insider trading during the class

period"); *Kriendler*, 877 F.Supp. at 1154 n. 12 (same). Here, four of the five defendants sold large percentages of their DZ holdings just after the company announced the acquisitions on July 18, 1994. That announcement prompted a stock price increase of 20%, up to $20.25 per share. The price remained in this range during the time defendants unloaded their shares. But afterward, when DZ told the public about the $15.1 million charge against earnings, stock value dove to just $14 per share. Under these facts, defendants' write-off timing appears not to be business judgment, but rather calculated to allow defendants an opportunity to profit at investors' expense.

### C. The Acquisitions Claim Complies with Rule 9(b)

 As noted above, Rule 9(b) requires securities fraud claims to specify the time, place and contents of the alleged misrepresentations, the identities of the persons making the misrepresentations, and the way in which the misrepresentations were disseminated. *See Sears*, 912 F.2d at 893; *Reshal*, 754 F.Supp. at 1230. Just as defendants attacked the accounting allegations for lack of particularity based on 9(b), they raise this challenge to plaintiffs' acquisitions claims. However, in doing so, defendants commit the same error. Instead of focusing on the who, what, where, when, and how of the misrepresentations, defendants criticize plaintiffs for their inability to retroactively monitor the defendants' every move.

For example, defendants would have plaintiffs plead the particulars of the due diligence analysis performed in connection with DZ's acquisitions. They want to know, among other things, "what constituted the 'sufficient analysis,' 'who' performed the analysis, 'what' they learned or 'what' they concluded, 'when' the learning and concluding occurred and 'how' they did all of this." Def.Mot.Dismiss at 16. Defendants' additional attacks merit no further discussion, for none addresses the subject of 9(b)—pleading the misrepresentations with particularity.

Put simply, Rule 9(b) does not require intimate details about every paragraph in the complaint, which must necessarily be drafted without the benefit of discovery. Plaintiffs " 'cannot be expected to have personal knowledge of the details of corporate internal affairs.' " *Chambers*, 848 F.Supp. at 620 (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 285 (3d Cir.1992), *cert. denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992)). Even with respect to alleging misrepresentations, "where the facts necessary for more specific pleading are not immediately accessible to plaintiffs, further detail is not required." *Reshal*, 754 F.Supp. at 1231. For example, many courts allow "group pleading," the practice of attributing misrepresentations to the defendants collectively, when this information is in the defendants' exclusive possession. *See Chambers*, 848 F.Supp. at 622 (requiring plaintiffs alleging corporate fraud to identify which defendants committed which acts "would place an unsurmountable obstacle in the way of such suits"); *Reshal*, 754 F.Supp. at 1231–32 (plaintiffs must distinguish among defendants only to the extent that they may reasonably be expected to do so); *Banowitz v. State Exch. Bank*, 600 F.Supp. 1466, 1469 (N.D.Ill.1985) (same).

However, plaintiffs' acquisition claims need not be rescued by liberal pleading standards. Their allegations on this subject plainly satisfy Rule 9(b). First, plaintiffs identify and date the documents that contain misleading statements about the effect of DZ's acquisitions: a July 18, 1994 press release, a July 20 press release, DZ's second quarter 10–Q, and a November 9 press release. Second, they quote specific portions of these documents, as well as provide the information that the documents omit. Third, where possible, plaintiffs name the defendant making the statement—for example, Flynn made the comment in the July 20 press release that the merger had forged a "strong player," as well as the remark about "putting this charge behind" the company on November 9.[13] Finally, by linking these statements to specific

---

**13.** As to the identity of the person writing the July 18 press release, the Court is comfortable in finding that this fact is not easily accessible to the plaintiffs. In addition, although plaintiffs do not say who endorsed the second quarter 10–Q, one can reasonably infer that it was Mitchum, since he signed the first quarter 10–Q.

omissions, plaintiffs show how the defendants made the statements misleading, and explain how this worked a fraud on the market.

Based on the above analysis, the Court finds that plaintiffs have pled a case for securities fraud with regard to their acquisition claims.[14] Accordingly, defendants' motion to dismiss is denied as to these claims.

### III. The Expansion Allegations

Plaintiffs' expansion allegations boil down to the contention that through a number of pronouncements concerning DZ's ability to expand in size and wealth, defendants fostered the illusion that DZ was growing and profitable when, in fact, it was not. Defendants rejoin with two legal objections: (1) plaintiffs have not pled any misstatements or shown that defendants made projections without a reasonable basis; and (2) plaintiffs' expansion allegations fail Rule 9(b).[15]

### A. The Expansion Predictions Lacked a Reasonable Basis

■ Like the defendants' statements predicting that the acquisitions would have a positive impact on DZ, the defendants' growth projections are forward-looking statements. As such, they can be shown misleading if plaintiffs allege facts demonstrating that the projections had no reasonable basis at the time they were made. *Wielgos*, 892 F.2d at 513; *Kas*, 815 F.Supp. at 1170. Plaintiffs cite several instances in which defendants, without a reasonable basis, created the impression that DZ could successfully pursue its aggressive expansion plan. The Court will examine two of these statements, by way of example.[16]

■ First, in his March 31, 1994 interview with *Reuters*, defendant Mitchum said

he was comfortable with estimates that DZ would increase its per share earnings by six times in the coming year. Plaintiffs contend that this statement had no reasonable factual basis. They argue that because Mitchum was allegedly aware at the time that the previous year's income had been artificially inflated by GAAP violations, he knew DZ's profits were illusory, and consequently could not support the kind of growth that analysts were projecting. This Court agrees that these allegations are sufficient, and notes that, according to the complaint, DZ would have sustained a $2 million loss in 1993 had it not been for its GAAP violations. Under these circumstances, it was unreasonable for defendants to predict such large gains in earnings for 1994. *See Chambers*, 848 F.Supp. at 619 (denying motion to dismiss where defendants misrepresented the company's prospects for future profitability by inflating current income using an improper method of capitalizing costs).

■ Second, even after reporting 1994 third quarter losses of over $16 million, defendants continued to insist that DZ could meet its growth targets. The third quarter 10–Q filed November 21, 1994 assured investors that the company was "continuing to pursue its FunCenter development schedule." Plaintiffs contend, and we find their argument persuasive, that defendants had no reasonable basis for telling the public that the company could keep expanding in the face of such devastating losses.

The court in *Searls v. Glasser*, 1993 WL 28746 (N.D.Ill. Feb. 3, 1993), was dealt a similar set of facts. In that case, the plaintiff alleged that defendants' statements about the company's business outlook misrepresented

---

**14.** The Court does not delve into defendants' extended discourse on how "the market knew the truth" about the possible adverse consequences of DZ's acquisitions. Assessing such a "truth on the market" defense involves an intensive factual inquiry, which is premature on a motion to dismiss. *Schaffer*, 924 F.Supp. at 1309.

**15.** Defendants make no attempt to refute scienter in connection with plaintiffs' expansion allegations. Consequently, the Court expresses no opinion on this issue.

**16.** The Court need not isolate every statement in the complaint, and analyze whether each one, by

itself, was rendered misleading by virtue of a particular omission. *Kas*, 815 F.Supp. at 1171. Instead, we read the complaint as a whole, keeping in mind that the "central issue" is whether "defendants' representations, taken together and in context, would have misled an investor." *McMahan*, 900 F.2d at 579. Plaintiffs have failed their burden only if the court finds that "an alleged omission clearly would not render any identified affirmative statement or statements made by Defendants misleading under any set of facts." *Kas*, 815 F.Supp. at 1172.

what they "knew to be a deteriorating prospect for continued growth." *Id.* at *4. Sustaining the complaint, the court held that the defendants had "a duty not to make material misrepresentations regarding forecasted performance." *Id.* The same logic applies here. By November of 1994, defendants were allegedly well aware that, due to previous accounting manipulations and write-offs necessitated by the acquisitions, DZ faced poor prospects for growth. Defendants had a duty to present DZ's outlook taking these facts into account. Because they instead "ignored facts seriously undermining the value of the forecast," defendants' expansion projections were unreasonable and misleading. *See Marx*, 507 F.2d at 490.

### B. The Expansion Claims Pass the Rule 9(b) Test

■ Plaintiffs supply the who, what, when, where, and how of the defendants' misrepresentations about DZ's prospects for expansion. Drawing from the examples above, the Court observes that plaintiffs point to specific statements—Mitchum's interview with *Reuters* and DZ's third quarter 10–Q—and date them. Plaintiffs go on to describe the contents of Mitchum's interview and the 10–Q as they relate to DZ's growth prospects. Finally, plaintiffs explain why both Mitchum's statements in the interview and DZ's third quarter 10–Q lacked a reasonable basis for projecting expansion. Consequently, plaintiffs have complied with Rule 9(b).

Because plaintiffs' expansion allegations state a claim under 10b–5, defendants' motion to dismiss them is denied.

### IV. Controlling Person Liability

■ Plaintiffs claim that the individual defendants are secondarily liable for securities fraud under § 20(a) of the 1934 Securities Exchange Act as "controlling persons" of the corporation.[17] In this Circuit, a claim for controlling person liability must plead two elements: (1) that the defendant actually exercised general control over the operations of the entity; and (2) that the defendant had the power or ability to control the specific acts constituting the primary violation. *Donohoe v. Consolidated Operating & Prod. Corp.*, 982 F.2d 1130, 1138–39 (7th Cir.1992); *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880–81 (7th Cir.1992), *cert. denied*, 509 U.S. 904, 113 S.Ct. 2994, 125 L.Ed.2d 688 (1993). Ordinarily, whether a defendant is a "controlling person" under § 20(a) is a question of fact that cannot be determined at the pleading stage. *Chambers*, 848 F.Supp. at 618.

■ However, to the extent the Court can resolve the issue at this point in the litigation, we find that plaintiffs have successfully stated a claim for controlling person liability. As § 20(a) requires, plaintiffs allege facts showing that the defendants exercised general control over DZ's operations. Flynn was Chairman and CEO of DZ, and served as one of its directors. Mitchum was DZ's Vice President and CFO. Casini was Vice President, Secretary and General Counsel; Seegers was President, Chief Operating Officer and a director; and McCarthy was a director. All the defendants are thus alleged to be top-ranking company officials whose high-level positions necessarily involve general oversight and direction.

But plaintiffs do not rest on pleading control by position. They also describe the defendants' power to direct the specific violations at issue in this case. The complaint states that all defendants controlled the contents of DZ quarterly and annual reports and press releases, the documents containing the alleged misrepresentations. Plaintiffs further point out that each defendant was privy to adverse non-public information about DZ by way of access to internal company documents, communications with other officers and directors, and attending management and board meetings. Finally, each defendant is claimed to have had some role in DZ's due

---

**17.** Section 20(a) of the Act provides:
Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
15 U.S.C. § 78t(a).

diligence investigation into the acquisitions, which allegedly revealed the acquisitions' likely negative effect on the company. These allegations satisfy the second, "potential for control" prong of the controlling person liability test.

The court in *Reshal Associates v. Long Grove Trading Co.* explained that, in cases where controlling person liability is a secondary theory applicable to persons already claimed to be primarily liable, § 20(a)'s pleading requirements are somewhat relaxed:

> There is a difference, however, between this case and the majority of the cases requiring particularized allegations supporting secondary liability. In this case, the secondary liability allegations are not directed toward third parties, such as banks or accountants; rather, they are alternative theories directed toward individuals or entities who are also alleged to be primarily liable. To require particularized allegations may well require plaintiffs to allege an unnecessarily complicated arrangement. . . .
>
> . . . .
>
> The Court can see little benefit to dismissing the complaint and requiring plaintiffs to perform this exercise, where the basic theory of the complaint is clear and its factual allegations, accepted as true, do not raise doubts as to the existence of a cause of action or the participation of each defendant.

754 F.Supp. at 1233.

The defendants' motion to dismiss plaintiffs' claims of controlling person liability under § 20(a) is denied.

### V. Post–January 17, 1995 Statements

■ The complaint sets forth a number of allegedly fraudulent statements made after January 17, 1995, the date when the last class representative purchased DZ stock. Plaintiffs ask this Court to extend the putative class period beyond this point, to September 15, 1995, the date defendants allegedly came clean about DZ's dim prospects.

Until this date, plaintiffs contend, the defendants continued to misrepresent the true state of the company. As developed further in the accompanying Memorandum Opinion and Order certifying the plaintiff class, the Court will end the class period on January 17, 1995. Past this point, an essential element of the 10b–5 claim, the purchase or sale of securities in reliance on market price integrity, is wanting. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (Rule 10b–5 applies only to fraud committed in connection with the purchase or sale of securities).

In *Roots Partnership v. Lands' End, Inc.,* the Seventh Circuit held that post-purchase statements cannot form the basis for 10b–5 liability in a fraud-on-the-market case because they could not have affected the price at which the class representative bought stock. 965 F.2d at 1420. Moreover, the class representative could not purport to represent the interests of later purchasers. *Id.* at 1420 n. 6. Accordingly, the court dismissed the portion of the plaintiffs' claim premised on statements made following the class representative's investment, and ended the class period on that date. *Id.*

In the case before this Court, plaintiff Bernard Weisburgh was the last named class member to buy DZ stock. This transaction was completed on January 17, 1995; therefore, Weisburgh's reliance on defendants' statements and their attendant impact on market price ended on this date. Absent reliance on market price integrity, there is no fraud on the market. Nor can Weisburgh adequately represent post-January 17, 1995 purchasers.[18] The Court thus grants defendants' motion to dismiss as it pertains to alleged misrepresentations occurring after January 17, 1995. However, defendants have not moved to strike these statements, and the Court will permit them to be retained in plaintiffs' complaint as potential circumstantial evidence of fraud perpetrated before the purchase date. *See Searls,* 1993 WL 28746, at *5 n. 1.

---

**18.** The Court addresses in its class certification opinion the plaintiffs' argument that, in cases involving an alleged common scheme to defraud, class representatives may represent subsequent purchasers.

## CONCLUSION

Defendants' motion to dismiss under Rules 12(b)(6) and 9(b) is hereby denied, except as to the portion of plaintiffs' claims relating to alleged misrepresentations made after January 17, 1995.