SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Peter CASERTA, Salvatore Marino, Dana C. Verrill, Defendants.

No. 97–CV–7091 (FB).

United States District Court, E.D. New York.

Dec. 8, 1999.

Kevin P. O'Rourke, Mark A. Adler, Linda Chatman Thomsen, Sean X. McKessy, Securities and Exchange Commission, Washington, D.C., for plaintiff.

Andrew J. Maloney, Kramer Levin Naftalis & Frankel, New York City, for defendant Peter Caserta.

Robert J. Costello, Gibney, Anthony & Flaherty LLP, New York City, for defendant Salvatore Marino.

## MEMORANDUM AND ORDER

BLOCK, District Judge.

Spectrum is a public corporation which holds technology patents allowing data transmissions to be made over cellular telephone networks. From 1991 through 1994, Peter Caserta ("Caserta") served as Spectrum's President, Chief Executive Officer ("CEO") and Vice Chairman of the Board of Directors, and Salvatore Marino ("Marino") was Spectrum's Treasurer and Chief Financial Officer ("CFO"). Dana Verrill ("Verrill") served as Chairman of the Board and President prior to Caserta's term in office.

The Securities and Exchange Commission ("SEC") has brought this action against Caserta, Marino and Verrill for violations of several federal securities antifraud statutes. It alleges that: (1) Caserta and Verrill participated in an illegal scheme to sell unregistered securities: (2) Caserta and Marino knowingly made material misrepresentations to the media and in Spectrum's financial reports to the SEC: and (3) Caserta and Marino engaged in insider trading when they sold more than ten million dollars of Spectrum stock while they possessed material, non-public information. Based on these alleged violations, the SEC seeks to enjoin each of the defendants from committing future securities laws violations and, in respect to Caserta and Marino, prohibiting them from acting as officers or directors of an issuer of securities or a company subject to SEC filing requirements. It also seeks to have Caserta and Marino disgorge all losses avoided in regard to their insider trading, and asks that civil penalties be assessed against all defendants.

Caserta and Marino move pursuant to Federal Rule of Civil Procedure ("FRCP") 56 for summary judgment to dismiss to the complaint in its entirety.[1] Caserta argues that the sale of unregistered securities claim is barred by the statute of limitations. Because this argument appears to only attack the sufficiency of the complaint, the Court will construe this branch of the motion as brought pursuant to FRCP 12(b)(6).[2] Together, Caserta and

---

**1.** Verrill has not made any motions to dismiss the complaint against him.

**2.** "Whether denominated a motion to dismiss or a summary judgment motion, when a de-

Marino argue that they should be granted summary judgment on the misrepresentation and insider trading claims because they complied with Generally Accepted Accounting Principles ("GAAP") and relied on the advice of Spectrum's accountants. In respect to the insider trading claims, they contend, in any event, that the information which the SEC alleges they traded upon was neither public nor material. In addition. they seek attorney fees under the Equal Access to Justice Act. The motion is denied in its entirety.

## BACKGROUND

The following facts are drawn from the complaint. Defendants' Statement Pursuant to Local Rule 56.1 ("Def.Stmt."), Plaintiff SEC's Statement of Genuine Issues and Response to Defendants' Statement of Undisputed Facts ("Pl.Stmt."), and various exhibits. Except as otherwise noted, they are not in dispute.

## I. Sale of Unregistered Securities

In its complaint, the SEC alleges that from early 1992 through December 1992, in order to raise $3,000,000 for Spectrum, Caserta and Verrill developed and implemented a program to sell unregistered Spectrum stock through the manipulation of an employee option plan. The complaint alleges that the underlying scheme began "in 1992," Complaint. ¶ 67. In conjunction therewith, "Caserta and Verrill solicited a newly-hired Spectrum employee to exercise options between September and December of 1992," and "Verrill arranged for a broker to fund the exercise of these options and sell the underlying stock." *Id.* ¶ 70.

## II. Events Leading To Sale of Registered Stock

### A. *Licensing and Advertising Agreements*

Between May and October 1993, Spectrum entered into agreements with, *inter alia,* Megahertz Corporation ("Megahertz"), Apex Data Corporation ("Apex Data") and U.S. Robotics, Inc. ("U.S.Robotics") to license Spectrum technology patents for use in modems. Each licensing agreement was executed contemporaneously with a separate advertising agreement between Spectrum and the respective licensee.

Caserta and Marino maintain that the licensing and advertising agreements were memorialized in separate contracts because they involved distinct legal obligations. The SEC contends, however, that the agreements were "companion paper transactions comprising part of a single agreement between Spectrum and each of the [l]icensees," Pl.Stmt. ¶ 3, but were kept separate, at Caserta and Marino's direction, "to create the illusion that [Spectrum] was obtaining a seven figure licensing fee from the licensees", whereas, in reality the licensing fees were essentially offset by advertising fees which Spectrum agreed to pay to the licensees under the advertising agreements "irrespective of whether or not any advertising had been done or any product developed." *Id.*

These licensing and advertising agreements were as follows:

### 1. *Megahertz*

On May 10.1993, Spectrum signed licensing and advertising agreements with Megahertz. Pursuant to the licensing agreement, Spectrum granted Megahertz the right to use its patented technology at

---

fendant raises an affirmative defense that is obvious on the face of plaintiff's pleadings, and the court makes its ruling based only on those pleadings, the motion is treated as a Rule 12(b)(6) motion to dismiss." *Aldahonda–Rivera v. Parke Davis & Co.,* 882 F.2d 590, 592 (1st Cir.1989); *see* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2713 (3d ed. 1998) ("In view of the purpose of the rules to secure the just, speedy, and inexpensive determination of every action. the courts naturally are reluctant to refrain from properly disposing of a motion merely because its form is incorrect.").

a royalty rate of $1.00 for each modem Megahertz produced using that technology. In addition, Megahertz agreed to pay Spectrum a "sign-up" fee of $1,500.00, with $250.000 to be paid upon signing, and $250,000 to be paid on each of five quarterly dates specified in the licensing agreement. In the advertising agreement. Spectrum agreed to pay Megahertz $1.25 million to include Spectrum's logo on the packaging and documentation for Megahertz modems containing Spectrum technology. The advertising payments were to be made in $250,000 installments on each of the same five dates on which Megahertz agreed to make the licensing installment payments. The agreements did not provide for adjustments in the quarterly licensing and advertising payments based upon the quantity of modems produced by Megahertz.

## 2. Apex Data

In mid-July 1993, Spectrum entered into licensing and advertising agreements with Apex Data. In the licensing agreement, Apex Data obtained the right to use Spectrum technology at a royalty rate of $5.00 for each modern produced by Apex Data which used Spectrum's technology; the rate would be reduced if Apex Data included Spectrum's technology in all of its modem products. Additionally, Apex Data agreed to pay Spectrum a "sign-up" fee of $1.55 million, with $5,000 to be paid upon signing, $45,000 to be paid after Spectrum completed certain engineering, and 250,000 installments to be paid on each of six quarterly dates specified in the licensing agreement. In the advertising agreement, Spectrum agreed to pay Apex Data $1.5 million for using Spectrum's logo in the packaging and documentation for any Apex Data modems which used Spectrum technology. Payment was to be made in $250,000 installments on each of the dates on which Apex Data agreed to make its licensing installment payments. Once again, the agreements did not provide for the quarterly licensing and advertising payments to be correlated to modem productivity.

## 3. U.S. Robotics

On October 25, 1993, Spectrum signed licensing and advertising agreements with U.S. Robotics. In the licensing agreement, Spectrum granted U.S. Robotics the right to use Spectrum technology at a royalty rate of $2.50 for each modem produced by U.S. Robotics which employed that technology. U.S. Robotics agreed to pay Spectrum a "sign-up" fee of $1,500,-000, with $100,000 to be paid upon signing, $150,000 to be paid upon the first sale or delivery by U.S. Robotics of modems using Spectrum's technology, and $250,000 to be paid on each of five quarterly dates specified in the licensing agreement. In the advertising agreement, Spectrum agreed to pay $1.25 million to U.S. Robotics to include Spectrum's logo on the packaging and documentation of any U.S. Robotics modems that used Spectrum technology. Payment was to be made in $250,000 installments on each of the same dates that U.S. Robotics agreed to make the licensing installment payments. As with the Megahertz and Apex Data agreements, the U.S. Robotics agreements did not provide for adjustments in the quarterly licensing and advertising payments based upon modem productivity.

## B. SEC Filings

Spectrum's financial statements listed the cash received from Megahertz. Apex Data and U.S. Robotics, and treated the anticipated future installment payments from these licensees as accounts receivable. Although Spectrum recorded the corresponding offsetting future advertising fees as accounts payable, it amortized these payments over a three-year period. It also recognized the anticipated benefits of the advertising as assets.

These financial statements were reflected in SEC filings subscribed to by Caserta and Marino as officers of Spectrum. Thus, on August 16, 1993. Spectrum filed with the SEC its 10Q quarterly report for the quarter ending June 30, 1993. In this 10Q, Spectrum reported the

agreements with Megahertz and Apex Data—although the Apex Data agreements were not signed until mid-July—and, in reliance thereon, increased its net income for that quarter by $3,050,000. On November 30, 1993. Spectrum filed its 10Q quarterly report for the quarter ending September 30, 1993. Here, it reported the agreements with U.S. Robotics—although they were not signed until mid-October 1993—and, in reliance thereon, increased its net income for that quarter by $1,500,000. According to the SEC, these figures represented a 670% overstatement of net income for the June 30th quarter, and a 193% overstatement of net income for the September 30th quarter. In a footnote in each filing, Spectrum briefly explained the purpose and terms of the licensing and advertising agreements, but failed to mention, *inter alia,* the offsetting nature of the licensing/advertising payments, or that the licensing and/or advertising installment payments under the agreements were not correlated to the production of modems containing Spectrum technology. On December 1, 1993, Spectrum filed with the SEC its annual S-8 registration statement, which referenced both 10Qs.

According to Caserta and Marino, these accounting treatments met with the approval of Spectrum's accountant, the Arthur Andersen firm ("AA"). The SEC contends, however, that an AA partner, Jeffrey Steinberg, advised Marino that the Apex Data and U.S. Robotics transactions had to be recognized in the quarters when the agreements were actually executed. Furthermore, the SEC maintains that Marino, with Caserta's knowledge, proposed the basic accounting treatment to Steinberg, and sought to obtain Steinberg's approval of a 17-year amortization for the advertising expenses.

In October 1993, AA provided Marino with a memorandum as to questions and answers ("Q & A") that AA anticipated would be asked at Spectrum's annual shareholders' meeting that month. The Q & A stated that Spectrum's accounting treatment of the agreements was in accordance with GAAP. Notably, AA had not audited Spectrum's financial statements.

The SEC's condemnation of Spectrum's accounting treatment of the Megahertz, Apex Data and U.S. Robotics transactions is best summarized in a report by its reputed expert, Sally Hoffman:

> By recognizing revenue for amounts that it would not collect until the future (the Uncollected Licensing Fee Installments) and by deferring expense for the exactly offsetting amounts that Spectrum had to pay in the future (the Unpaid Advertising Fee Installments). Spectrum's accounting treatment did not reflect the substance of the transactions. In essence, these future collections and payments were like a round robin in which each party would pay the other the exact same amount on the exact same day. In the end, neither party would increase or decrease its cash position: substantively, no money would change hands whatsoever.

> That Spectrum's accounting treatment so clearly contradicted the economic impact of the three licensing transactions is sufficient to conclude that it violated GAAP. However, in addition, the method utilized violated other accounting principles and concepts. For example, it disregarded the prohibition against recognizing contingent gains, failed to meet fundamental recognition criteria delineated in GAAP, and overlooked the uncertainty inherent in the transactions.

SEC Exhibit 158, at 10–11.

### C. Information Provided to the Media

After closing each transaction, Spectrum issued a press release stating that it would receive payments under the licensing agreements, but omitted any discussion of the advertising agreements. It also released press releases announcing its quarterly results.

Additionally, on May 11, 1993, Spectrum signed an agreement with AT & T granting it a license to use Spectrum's patents. AT & T agreed to pay Spectrum $150,000 up-front and future royalties on AT & T products using Spectrum's patented tech-

nology. That same day, Caserta predicted in an interview with a *Wall Street Journal* ("*WSJ*") reporter that Spectrum would "receive hundreds of millions of dollars in royalties" from equipment sold by AT & T and its affiliates. Defendants' Exhibit ("Def.Ex.") B. The prediction appeared in a *WSJ* article the next day, and Spectrum's stock price rose over the following days. On May 20, 1993, CNBC reported that AT & T had denied the royalty predictions, and Spectrum's stock price fell over the following days. After each 10Q filing. Spectrum issued press releases in which it announced net profits. The SEC claims that these releases, coupled with discussions with the press, disclosed only the licensing transactions but did not disclose the amortized "matching" advertising expenditures, and the consequent losses.

In respect to the 10Q filings, on September 23, 1993, *Bloomberg Business News* reported:

> [A] recent SEC filing reveals Spectrum will have to repay 85% of the upfront license fees it received from three firms that recently licensed its patents, in the form of advertising reimbursements.... Spectrum has declined to disclose either the royalty rate or the size of the "sign up" fees paid to Spectrum by AT & T or modem maker Apex Data Inc. Spectrum said it received an "upfront" fee of $1.5 million from a second modem maker, Megahertz, Inc. All of the companies licensed Spectrum's patents during the first quarter of fiscal 1994.... Spectrum reported $3.2 million in initial licensing fees during that quarter, which ended June 30, according to the company's 10–Q report filed with the Securities and Exchange Commission last month.... Spectrum also added a $2.75 million liability to its balance sheet during the quarter, representing money it will have to pay to its three licensees to reimburse them for publicizing "the use of Spectrum's technology in the products they produce." ... Revenue increased 32% to 22.6 million from $22.5

million.... Spectrum announced in May that it would receive an "upfront payment of $1.5 million" for licensing its patents from Megahertz. However, Megahertz said it paid an upfront fee of only $250,000. Megahertz will make additional payments totaling $1.5 million, and pay Spectrum $1 per modem royalty.

Def.Ex. B. A second *Bloomberg* article, published on October 13, 1993, included much of the same information. Thereafter, during an administrative hearing, a Megahertz official testified that he had provided David Evans, the *Bloomberg* reporter who wrote these articles, with certain information about the Spectrum–Megahertz agreements which Caserta did not want released to the public.

On October 18, 1993, Spectrum announced that it had hired John Sculley, the former CEO and Chairman of Apple Computer, as its CEO and Chairman. On the heels of the announcement, Spectrum's stock price rose by 46%.

### III. Sale of Registered Stock

In mid-November 1993, Caserta and Marino asked for, and received. Sculley's permission and Spectrum's inside and outside counsels' approval to exercise up to one-third of their stock options. Between November 15th and 18th. Caserta exercised options to purchase one million shares of Spectrum common stock at $1.125 per share, and immediately sold the underlying shares at prices between $9.25 and $10.375 per share, resulting in a profit of at least $8,125,000. Between November 24th and December 1st, Marino exercised options to purchase 300,000 shares at $1.125 per share, and immediately sold the underlying shares at prices between $8.625 and $9.25 per share, resulting in a profit of at least $2,250,000.[3]

### IV. Events Subsequent to Sale of Registered Stock

On or about November 23, 1993, on Sculley's initiative, Spectrum replaced AA

---

**3.** The motion papers before the Court do not indicate the exact percentage of Caserta and

with KPMG Peat Marwick ("KPMG") as Spectrum's accountants. In late January 1994, KPMG determined that the Megahertz, Apex Data and U.S. Robotics transactions were not reported in conformity with GAAP, that the overstatement of net income was material, and that the Apex Data and U.S. Robotics agreements had been prematurely recognized. Accordingly, it advised that Spectrum should restate its financial statements for the affected quarters.

Concurrently, rumors were circulating that Sculley planned to resign from Spectrum. On January 25, 1994, he publicly denied them. On February 7, 1994, at Sculley's direction, Spectrum restated its financial statements to show a loss of approximately $2,390,000. or $.03 per share, for the June 30th quarter, rather than an originally reported profit of approximately $400,000 for that quarter; and a net loss of approximately $5,315,000, or $.07 per share, rather than an originally reported profit of approximately $600,000 for the subsequent quarter.

Also on February 7th, Sculley announced his resignation. As he testified at his deposition, he never would have joined the company if he had known of its true financial condition. That same day, Spectrum's stock fell $3.00 per share. The SEC asserts that numerous telephone callers to Spectrum had inquired about the resignation and the restatement.[4]

## DISCUSSION

### I. Rule 12(b)(6) and Summary Judgment Standards

Regarding the motion to dismiss the sale of unregistered securities claim against Caserta, the Court's task is " 'necessarily a limited one.' " *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59, 62 (2d Cir.1997) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). In ruling on a FRCP 12(b)(6) motion, "the court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff." *See Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The Court should grant such a motion only if, after viewing the plaintiff's allegations in the most favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Id.*

Regarding the motion seeking summary judgment on the misrepresentation and insider trading claims, summary judgment should be granted only when, after reviewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The initial burden of demonstrating the absence of a disputed issue of material fact lies with the moving party. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies this burden, the non-movant " 'must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)); *see LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 64 (2d Cir.1999). The Court must draw all factual inferences in favor of the non-moving party. *See Fagan v. New York State Electric & Gas Corp.,* 186 F.3d 127, 131 (2d Cir.1999) (citing *In re Blackwood Assoc., L.P.,* 153 F.3d 61, 67 (2d Cir.1998)).

Marino's total options which they exercised, nor whether Caserta and Marino could have lawfully obtained permission to exercise more than one-third of their options.

4. Subsequently, a class action was initiated by investors against Spectrum and its officers and directors, and was settled. *See Home Ins.* *Co. of Illinois (New Hamsphire) v. Spectrum Info. Techs., Inc.,* 930 F.Supp. 825 (E.D.N.Y. 1996) (Block, J.). In May 1999, the SEC filed an administrative action against Steinberg and another AA accountant in connection with advice they gave Spectrum, which is *sub judice.*

## II. Sale of Unregistered Securities

 The SEC alleges that Caserta and Verrill sold unregistered securities in violation of Sections 3(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77c(a) and 77e(c) ]. which regulate the circumstances under which such securities may be sold to the public. Caserta contends that the claim is time-barred by the five-year statute of limitations of 28 U.S.C. § 2462 because "[a]lthough the Complaint does not allege actual dates, the purported sales appear from the Complaint to have occurred in 1991 and 1992," Defendants' Memorandum in Opposition ("Def.Mem.") at 34, and the action was commenced on December 3, 1997.

To the extent that the SEC seeks civil penalties from Caserta in regard to this claim, the five-year period of limitations is indeed a bar. There is, however, no statute of limitations in regard to equitable relief. See Johnson v. SEC, 87 F.3d 484, 491 (D.C.Cir.1996) (explaining differences between penalty and equitable injunctive relief); SEC v. Lorin, 869 F.Supp. 1117, 1120–31 (S.D.N.Y.1994) (explaining that disgorgement is an equitable remedy).

Giving the complaint the requisite liberal reading, it cannot be concluded on the face of the pleading that all of the options were exercised or all of the underlying stock was sold prior to December 3, 1992. If not, civil penalties could be predicated on the post-December 3rd activity. Moreover, it may well be that civil penalties could arguably also be predicated upon pre-December 3rd activity under the continuing violation doctrine, which applies when a violation occurring outside of the limitation period is so closely related to other violations which are not time-barred as to be viewed as part of a continuing practice for which recovery should be had

for all violations. See, e.g., Havens Realty Corp. v. Coleman, 455 U.S. 363, 380–81, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); Annis v. County of Westchester, 136 F.3d 239, 246 (2d Cir.1998). The complaint clearly alleges that all of the unregistered stock activity was part of a common scheme. However, it is not at all certain that the continuing violation doctrine applies in securities fraud litigation. See SEC v. Schiffer, CV–5853, 1998 WL 226101, at *3 (S.D.N.Y. May 5, 1998) (recognizing the issue as unresolved but denying § 2462 statute of limitations motion to strike civil penalty when discovery was incomplete and relevant facts were underdeveloped). At this pleading stage of the litigation, the Court will not resolve the issue since it will be academic if it is ultimately factually determined that all of the options were exercised and the stocks sold prior to December 3, 1992.

 Caserta asserts that barring him from ever holding a position as an officer or director of an issuer of securities or a company subject to SEC filing requirement, as requested by the SEC. would constitute a penalty under § 2462, and hence cannot be implemented in regard to the sale of unregistered securities claim. It is not at all certain that the SEC relies upon this claim in seeking such relief since its complaint asks for this sanction against Caserta and Marino, rather than against Caserta and Verrill, see Complaint. "Relief." at 18, and there is obviously ample basis for the bar if Caserta is found culpable on the misrepresentation or insider trading claims. In any event, if it be established that the purpose of the injunction would be to prevent Caserta from harming other companies or the securities market in the future, rather than to punish him for past wrongdoings, the sought-after relief would be remedial, rather than punitive. See Johnson, 87 F.3d 484.[5]

---

5. As stated by the D.C. Circuit in *Johnson v. SEC*, 87 F.3d 484, 489 (D.C.Cir.1996). where it held that a censure and six-month disciplinary suspension was a penalty: "This sanction would less resemble punishment if the SEC had focused on Johnson's current competence or the degree of risk she posed to the public.... [I]t is evident that the sanctions here were not based on any general finding of Johnson's unfitness as a supervisor, nor any showing of the risk she posed to the public, but rather were based on Johnson's alleged

Accordingly, the motion to dismiss in respect to the improper sale of unregistered securities claim against Caserta is denied.

## III. Misrepresentation Claims

### A. General Overview

The SEC has brought its misrepresentation claims against Caserta and Marino under Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a) ], proscribing the direct or indirect use of any device, scheme, or artifice to defraud, and the complementary and catchall provisions of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b) ] and SEC Rule 10b–5 [17 C.F.R. § 240. 10b–5], which are intended to prevent manipulations and misrepresentations in connection with the purchase or sale of any security. *See SEC v. Softpoint, Inc.,* 958 F.Supp. 846, 861–62 (S.D.N.Y.1997) (Sotomayor, J.), *aff'd,* 159 F.3d 1348 (2d Cir.1998) (Table); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 859 (2d Cir.1968) (en banc). "Section 10(b) and Rule 10b–5 liability can flow from 'misstatements and omissions in press releases, news articles, and quarterly and annual public filings.'" *Softpoint,* 958 F.Supp. at 862 (quoting *In re Ames Dep't Stores, Inc. Stock Litig.,* 991 F.2d 953, 962 (2d Cir.1993)). In order to establish such liability, the SEC must prove that the misstatement constituted a material misrepresentation, or a material omission if the defendant had a duty to speak, and that the defendant acted with scienter. *SEC v. First Jersey Secs. Inc.,* 101 F.3d 1450, 1467 (2d Cir.1996).[6] The SEC also contends that Caserta and Marino violated certain provisions of Section 13 of the Exchange Act [15 U.S.C. § 78m] and underlying rules [17 C.F.R. § 240.13a], requiring books and records, and SEC quarterly reports, to be true and accurate. *See United States v. Wallach,*

935 F.2d 445, 463 (2d Cir.1991). The Court concludes that the SEC has presented sufficient facts in support of these claims against Caserta and Marino to withstand their summary judgment motion.

### B. The Misrepresentations

■ A statement made in violation of GAAP may be found to be misleading or inaccurate under the federal securities laws. *See In re Physician Corp. of Am. Secs. Litig.,* 50 F.Supp.2d 1304, 1317 n. 17 (S.D.Fla.1999) ("[B]ased on the particularities of the facts and circumstances alleged, facts demonstrating overstatement of revenues and income in violation of GAAP may constitute the false and misleading statements of material fact necessary for alleging a violation of Rule 10b–5."); *Carley Capital Group v. Deloitte & Touche, L.L.P.,* 27 F.Supp.2d 1324, 1335 (N.D.Ga. 1998) (same); *Gross v. Medaphis Corp.,* 977 F.Supp. 1463, 1472 (N.D.Ga.1997) (same); *In re Discovery Zone Secs. Litig.,* 943 F.Supp. 924, 934–37 (N.D.Ill.1996) (same). Although GAAP has not been codified by any government regulatory body, Regulation S–X, 17 C.F.R. §§ 210.1–02(a)(2), 249.308a, which governs the filing of quarterly reports with the SEC, provides that "[f]inancial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures unless the Commission has otherwise provided." *See also* 17 C.F.R. § 210.4–01(a)(1).

■ GAAP are "the conventions, rules, and procedures that define accepted accounting practices." *United States v. Arthur Young & Co.,* 465 U.S. 805, 811 n. 7, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984). "GAAP is an amalgam of statements is-

failure reasonably to supervise Zetterstrom, as required by section 15(b) of the Securities Exchange Act of 1934."

**6.** In private action securities litigation, the plaintiff has the additional burden of proving reasonable reliance on the defendant's mis-

representation or omission, and that it "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4); *see Litton Indus., Inc. v. Lehman Brothers Kuhn Loeb Inc.,* 967 F.2d 742, 747–49 (2d Cir.1992) (discussing plaintiff's reliance and causation burdens).

sued by the American Institute of Certified Public Accountants [AICPA] through successive groups it has established to promulgate accounting principles.... GAAP includes broad statements of accounting principles amounting to aspirational norms as well as more specific guidelines and illustrations." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1420 n. 10 (3d Cir.1997) (citations and quotations omitted). GAAP characterizes "the range of reasonable alternatives that management can use" to present financial information. *Id.* (citing *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 544, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979)). "An accounting procedure that accords with a Statement of Financial Accounting Standards ("SFAS") pronouncement by the Financial Accounting Standards Board [ ("FASB") ] is by definition a 'generally accepted accounting principle.'" *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.*, 927 F.Supp. 1297, 1304 (C.D.Cal. 1996) (citations omitted). The FASB is a subsection of the AICPA, and adopts industry wide standards for the financial accounting industry. *See Amerada Hess Pipeline Corp. v. Federal Energy Reg. Comm'n*, 117 F.3d 596, 601 (D.C.Cir.1997).

Spectrum's recognition of income implicated three important generally accepted accounting principles. First, FASB SFAS No. 5, ¶ 17(a) precludes the recognition of a gain contingency, which is an existing condition, situation or set of circumstances involving uncertainty as to a possible gain. Second, FASB Statement of Financial Accounting ("SFA") Concept No. 5 requires that in order to recognize an item in a financial statement, the item must demonstrate "reliability", meaning it must be "representationally faithful." FASB SFA Concept No. 2 defines "reliability" and "representational faithfulness" as "correspondence or agreement between a measure or description and the phenomenon it purports to represent. In accounting, the phenomena to be represented are economic resources and obligations and the transactions and events that change those resources and obligations."

*Id.* For recognition, an item must also demonstrate "measureability", which is met if the asset, liability or change in equity has "a relevant attribute that can be quantified in monetary units with sufficient reliability." FASB SFA Concept No. 5. Third, under FASB SFA Concept No. 6, ¶ 25, an asset must generate a "probable future economic benefit."

▪ Whether GAAP has been violated is a fact-specific issue. *See In re Burlington Coat Factory Secs. Litig.*, 114 F.3d at 1421 ("Moreover, assuming that consistency with GAAP is enough to preclude liability, it is a factual question whether [the defendant]'s accounting practices were consistent with GAAP."); *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir.1996) (reversing grant of summary judgment because the "district court was wrong in resolving the factual disputes which exist as to the underlying transactions," particularly their accordance with GAAP). Frequently, this determination turns on expert testimony. *See, e.g., Provenz*, 102 F.3d at 1490 ("Not only have plaintiffs provided documentary evidence that defendants may have recognized revenue before it was earned, they also provided expert testimony in support of their contentions."); *In re Discovery Zone Secs. Litig.*, 943 F.Supp. at 935 n. 9 ("Again, [regarding GAAP], the merits of amortization versus expensing under these facts is a topic to be explored by accounting experts."); *Fine v. American Solar King Corp.*, 919 F.2d 290, 298 (5th Cir.1990) (reversing grant of summary judgment because "a reasonable jury ... might believe the [p]laintiffs' expert and find that [defendant] knew that it was issuing a false and misleading report, or that it was severely reckless in issuing its report"); *SEC v. Chester Holdings, Ltd.*, 41 F.Supp.2d 505, 519–22 (D.N.J.1999) (finding that through the expert affidavit of Sally Hoffman, the SEC established that defendants' filings violated GAAP).

▪ By expert testimony, the SEC has raised issues warranting factual resolution as to whether Spectrum's accounting treat-

ment of the Megahertz, Apex Data and U.S. Robotics transactions accorded with GAAP: First, whether Spectrum recognized income which was subject to multiple impermissible contingencies, and therefore violated SFAS No. 5, ¶ 17(a). In that regard, the fact-finder will determine to what extent the licensing fee payments were contingent upon Spectrum's payment of advertising fees, and whether the realizability of the advertising assets were contingent upon both the payment of the matching licensing and advertising fees and the uncertain deployment of Spectrum's technology. Second, even if these contingencies were satisfied, whether Spectrum's financial condition was unaffected by the matching licensing and advertising payments, thereby compromising the representative faithfulness or the demonstrative measurability of the reported revenues, in violation of SFA Concepts No. 2 and No. 5. Third, whether the advertising was likely to generate future revenues, and thus had "probable future economic benefit", as required by FASB SFA Concept No. 6.[7]

## C. Materiality

 The test of materiality is whether there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision. *See Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citing *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)), *SEC v. Mayhew,* 121 F.3d 44, 52 (2d Cir.1997) (citing *First Jersey Secs., Inc.,* 101 F.3d at 1466). "To be material, the information need not be such that a reasonable investor would necessarily change his investment decision based on the information, as long as a reasonable investor would have viewed it as significantly altering the 'total mix' of information available." *Mayhew,* 121 F.3d at 51 (citing *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. 2126) (other citation omitted). Material facts include any fact " 'which in reasonable and objective contemplation might affect the value of the corporation's stock or securities.' " *Id.* (citing *Texas Gulf Sulphur Co.,* 401 F.2d at 849 (citation omitted)). The facts upon which a reasonable investor might rely may come from quarterly and annual public filings, as well as press releases. *See In re Ames Dep't Stores, Inc. Note Litig.,* 991 F.2d 968, 974–76 (2d Cir.1993). "Profit statements generally will be of particular interest to investors. After all, by their

7. Even if Spectrum's statements are ultimately determined to have accorded with GAAP, it does not necessarily follow that a finding of fraud would thereby be precluded. *See, e.g., Monroe v. Hughes,* 31 F.3d 772, 774 (9th Cir.1994) ("compliance with GAAP ... do[es] not immunize an accountant who consciously chooses not to disclose on a registration statement a known material fact"); *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 378 F.Supp. 112, 122 (S.D.N.Y.1974), *aff'd in part, rev'd in part on other grounds;* 540 F.2d 27 (2d Cir.1976) ("Fair presentation is the touchstone for determining the adequacy of disclosure in financial statements. While adherence to generally accepted accounting principles is a tool to help achieve that end, it is not necessarily a guarantee of fairness." (citation omitted)); *but see Provenz,* 102 F.3d at 1487 ("In reviewing the whole record, we find nothing that suggests this accounting decision violated GAAP or any of [defendant's] policies. Thus, we hold that the defendants' [accounting] decision ... is not actionable as

a false or misleading statement."); *SEC v. Price Waterhouse,* 797 F.Supp. 1217, 1225 (S.D.N.Y.1992) (after finding accounting and audit accorded with GAAP, the court stated: "It follows that the Court must reject the [SEC]'s contention that the aforesaid accounting and audit procedures were so defective as to permit a rational inference of fraud.").

The Court notes that the Code of Federal Regulations provides: "In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading." 17 C.F.R. § 240.12b–20; *see* 17 C.F.R. § 230.408. The impact of this regulation in the context of GAAP under the facts of the present case need not now be assessed in light of the Court's determination that issues of fact abound as to whether GAAP has been violated.

very nature, financial reports are relevant to investment decisions, with reports of current and past earnings likely to aid in predicting future earnings." *In re Kidder Peabody Secs. Litig.*, 10 F.Supp.2d 398, 410 (S.D.N.Y.1998). " 'Indeed, earnings reports are among the pieces of data that investors find most relevant to their investment decision.' ... Such information 'is likely to be highly material and of particular importance to the market.' " *Id.* (quoting *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d at 1420 n. 9 (citations omitted)).

■■■ "The materiality of information is a mixed question of law and fact." *Mayhew*, 121 F.3d at 51 (citing *First Jersey Secs., Inc.*, 101 F.3d at 1466); *see TSC Indus., Inc.*, 426 U.S. at 449, 96 S.Ct. 2126. It should generally be presented to the jury. *See Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 171 (2d Cir.1999) (quoting *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir.1999)). "Only if no reasonable juror could determine that the undisclosed information would have assumed actual significance in the deliberations of the reasonable investor should materiality be determined as a matter of law." *Id.* (alterations, citation and quotation marks omitted).

■■■ The SEC has adduced sufficient facts which, if proven, would permit a factfinder to conclude that the nature of the GAAP violations would have affected a reasonable investor's assessment of the value of Spectrum's stock. The alleged misstatements in the financial statements allowed Spectrum to state a profit in its 10Qs and annual registration statement, and Spectrum's press releases and press interviews further disseminated to the public these alleged misstatements and artificial profits. While Caserta and Marino seek to minimize the amount of profits by focusing on the per share profit, with regard to Spectrum's overall success, the restatement resulted in Spectrum posting millions of dollars in losses. In light of Spectrum's relatively small size, these losses were significant. Moreover, treating the licensing fees as revenue allowed Spectrum to suggest to investors that its patents were quite valuable to the telecommunications industry, especially in conjunction with its optimistic predictions regarding the AT & T transaction. A reasonable investor could have believed that all this information augured well for Spectrum's future, and accordingly could rationally have purchased or retained Spectrum stock.

### D. Scienter

■■■ Scienter refers to "a mental state embracing [an] intent to deceive, manipulate, or defraud." *Aaron v. SEC*, 446 U.S. 680, 686 n. 5, 100 S.Ct. 1945, 64 L.Ed.2d 611 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). Ascertaining one's state of mind is a quintessential factual exercise. *See Ormiston v. Nelson*, 117 F.3d 69, 72 n. 4 (2d Cir.1997) ("Where there are disputed issues of material fact as to plaintiff's state of mind at the time [of the relevant event], resolution of these factual questions should be left to the trier of fact."); *see also Gallo v. Prudential Residential Servs. L.P.*, 22 F.3d 1219, 1224 (2d Cir.1994) ("A trial court must be cautious about granting summary judgment" when "intent is at issue."); *Wechsler v. Steinberg*, 733 F.2d 1054, 1058 (2d Cir.1984) ("In a § 10(b) action, a court may not grant [summary judgment] to the defendants on the ground of lack of scienter unless the plaintiff has failed to present facts that can support an inference of bad faith or an inference that defendants acted with an intent to deceive."). In the context of securities fraud cases, scienter may be shown in the Second Circuit "either (a) by [ ] facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (b) by [ ] facts to show that defendants had both motive and opportunity to commit fraud." *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir.1999); *see SEC v. U.S. Environmental, Inc.*, 155 F.3d 107, 111–12 (2d Cir.1998) (allegations of knowledge of, or reckless

participation in, the proscribed activity is sufficient to plead scienter under § 10(b)); *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir.1998) (defining recklessness in an SEC misrepresentation case as "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care" (quotation marks and citation omitted)).[8]

■ In regard to "conscious misbehavior" or "recklessness," although a violation of GAAP "may not in itself be sufficient" to satisfy either standard. *Stevelman*, 174 F.3d at 84, courts have found that egregious violations of GAAP, or GAAP violations together with other evidence, may suffice. *See Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 234–36 (D.Mass. 1999) (drastic overstatements of revenue based on failure to properly account for cross-licensing payments, late recognition of revenue and violation of company's policy gave rise to finding of scienter); *Chester Holdings*, 41 F.Supp.2d at 519–20 (finding requisite scienter when, *inter alia*, financial statements overstated value of four acquisitions by 156%, 36%, 50% and 191%); *Carley Capital Group*, 27 F.Supp.2d at 1335–36 (GAAP violations which resulted in drastic overstatement of earnings and understatement of expenses may give rise to an inference of scienter); *Bell v. Fore, Sys., Inc.*, 17 F.Supp.2d 433. 437 (W.D.Pa.1998) (GAAP allegations coupled with detailed description of alleged fraudulent transactions sufficient to allege scienter); *Gross*, 977 F.Supp. at 1472 (allegations of GAAP violations coupled with allegation that defendants provided customers with secret side letters relieving them of their obligations sufficient to allege scienter); *Marksman Partners, L.P.*, 927 F.Supp. at 1305 (enormous overstatement of revenues in violation of GAAP indicative of scienter); *Freedman v. Louisiana–Pacific Corp.*, 922 F.Supp. 377, 390–

92 (D.Or.1996) (recognition of income likely to be returned to purchasers violative of GAAP and supportive of a finding of scienter); *see also Novak v. Kasaks*, 26 F.Supp.2d 658, 663 (S.D.N.Y.1998) (dismissing complaint when plaintiff failed to plead adequate "violations of GAAP [which] may give rise to an inference of fraudulent intent only when coupled with other specific and properly pled allegations of fraud"); *In re Health Mgmt., Inc. Secs. Litig.*, 970 F.Supp. 192, 203 (E.D.N.Y. 1997) (in action against accountants, denying motion to dismiss when plaintiff pleaded violations of GAAP and existence of "red flags" which defendant should have recognized as evidence of fraudulent scheme); *In re Chambers Dev. Secs. Litig.*, 848 F.Supp. 602, 619 (W.D.Pa.1994) (denying motion to dismiss when complaint gave rise to the plausible "inference that the [ ] Defendants acted in concert with [the accountant], indeed directed the accounting/auditing firm to hide expenses and inflate net worth by 'creative' accounting practices" in violation of GAAP).

■ Good faith reliance on the advice of an accountant or an attorney has been recognized as a viable defense to scienter in securities fraud cases. *See SEC v. Goldfield Deep Mines Co. of Nev., AAA*, 758 F.2d 459, 467 (9th Cir.1985) (recognizing defense in regard to advice of counsel and representations of accountants in SEC action based on filing misleading and false 10Qs, but finding that defendant did not factually prevail); *Newton v. Uniwest Fin. Corp.*, 802 F.Supp. 361, 367–68 (D.Nev.1990), *aff'd*, 967 F.2d 340 (9th Cir. 1992) (granting summary judgment for defendant because, *inter alia*, plaintiff had not produced evidence to counter defense of good faith reliance on accountant); *Mathews v. Centex Telemgmt., Inc.*, No. C–92–1837, 1994 WL 269734, at *7 (N.D.Cal. June 8, 1994) (granting summary

---

**8.** Although *Stevelman* was a private action, and some district courts have questioned "whether recklessness is sufficient in an SEC enforcement action." *SEC v. Falbo*, 14 F.Supp.2d 508, 524 (S.D.N.Y.1998); *see SEC v. Softpoint*, 958 F.Supp. at 864 (employing a

"knowing misconduct" standard of scienter in a civil SEC enforcement action), the issue appears to have been resolved in *McNulty*, where the Second Circuit specifically applied the recklessness standard in a § 10(b) SEC action.

judgment for defendants because, in part, "[d]efendants also conferred with and relied in good faith on their outside auditor"); *see also Markowski v. SEC,* 34 F.3d 99, 104–05 (2d Cir.1994) (recognizing defense of advice of counsel, but stating that "[i]n light of the substantial evidence supporting the SEC's findings in this case, [defendant's] reliance upon advice of counsel, even if established, would not furnish a ground for reversal"). To establish the defense, the defendant should show that he/she/it made a complete disclosure, sought the advice as to the appropriateness of the challenged conduct, received advice that the conduct was appropriate, and relied on that advice in good faith. *See Newton,* 802 F.Supp. at 367–68; *see also United States v. Evangelista,* 122 F.3d 112, 117 (2d Cir.1997) (rejecting defense of reliance on accountant's advice in tax evasion case when defendant's conduct was contrary to advice); *Markowski,* 34 F.3d at 104–05 (setting forth elements of defense); *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1101 (2d Cir.1972) ("While good faith reliance on advice of counsel may be a factor to consider in deciding whether to grant injunctive relief [requested by the SEC], appellants' proven lack of good faith here precludes them from relying on this argument."); *SEC v. Scott,* 565 F.Supp. 1513, 1534–35 (S.D.N.Y.1983) (failure to provide counsel with timely and complete advice renders defense unavailable); *United States v. Erickson,* 601 F.2d 296, 305 (7th Cir.1979) ("If a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance.").

In the present case, a reasonable fact-finder can properly consider a host of asserted factors in evaluating Caserta and Marino's conduct regarding the misrepresentation claims under the scienter standard of either conscious misbehavior or recklessness, and the viability of their good faith defense. First and foremost, whether the nature and accounting of the licensing and advertising agreements, and the reported revenues flowing therefrom, were deceptive. Second, whether the concept of the dual licensing/accounting agreements was arguably conceived by Caserta and Marino, and whether they allegedly prevailed upon the licensees to agree to these arrangements. Third, whether Marino, with Caserta's apparent acquiescence, proposed the basic underlying concepts of the accounting treatment to Steinberg and AA, and sought to grossly distort revenues by seeking Steinberg's approval of a 17–year amortization for the matching advertising costs. Fourth, whether Caserta and Marino reported the Apex Data and U.S. Robotics agreements in the quarters before they were actually signed in conscious disregard of AA's advice. The fact-finder may also consider that the SEC 10Qs and annual statement were signed and filed by Caserta and Marino, and that Spectrum's financial statements were never audited by AA.[9]

9. Caserta and Marino contend that in the administrative action against the AA accountants the SEC made judicial admissions in its pleadings that Caserta and Marino relied upon AA's advice. *See* Def.Mem. at 23–24; Defendants' Reply Memorandum, at 3–4. Specifically, they rely primarily upon the following statement: "After being apprised of the material terms [by Spectrum], Steinberg and Geron concurred with Spectrum's proposed improper accounting treatment. They continued to do so thereafter. Further, Mr. Steinberg reviewed and assisted in drafting relevant sections of the resulting false and misleading statements which Spectrum included in its filings with the Commission." *See* Def.Ex. G.

This statement does not address the central issue of whether Caserta and Marino designed the transactions and persuaded AA to concur with Spectrum's proposed accounting, and whether under all of the circumstances Caserta and Marino could reasonably rely on whatever advice the accountants may have given them. The Court need not, therefore, determine under what circumstances, if any, pleadings in an administrative hearing involving different defendants would rise to the level of judicial admissions. *Compare Lopez–Reyes v.*

Accordingly, summary judgment cannot be issued dismissing the misrepresentation claims.[10]

### IV. Insider Trading Claims

■■■ "Rule 10b–5 also imposes liability for insider trading." *Softpoint*, 958 F.Supp. at 862 (citation omitted). Such liability arises "when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." *United States v. O'Hagan*, 521 U.S. 642, 651–52, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997); *see Dirks v. SEC*, 463 U.S. 646, 654–55, 663–64, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). Information becomes public when disclosed "to achieve a broad dissemination to the investing public generally and without favoring any special person or group, *Dirks*, 463 U.S. at 653 n. 12, 103 S.Ct. 3255 (citation omitted), or when, although known only to a few persons, [ ] trading on it 'has caused the information to be fully impounded into the price of the particular stock,' *United States v. Libera*, 989 F.2d 596, 601 (2d Cir.1993)." *Mayhew*, 121 F.3d at 50.

■■■ Scienter must once again be established. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995); *Schiffer*, 1998 WL 307375, at *3–*4; *Marksman Partners*, 927 F.Supp. at 1312. Usually, the scienter focus in insider trading claims is on the "opportunity and motive" prong. *See Markowski*, 34 F.3d at 104–05; *Marksman Partners*, 927 F.Supp. at 1312 ("Allegations that a corporate insider either presented materially false informa-

tion, or delayed disclosing materially adverse information, in order to sell personally-held stock at a huge profit can supply the requisite 'motive' for scienter allegation."); *Stevelman*, 174 F.3d at 85 (sale of large portions of stockholdings during period of misrepresentations probative of motive); *In re Apple Computer Secs. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989) ("Insider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter."); *but see Acito*, 47 F.3d at 54 (no insider trading claim when during period of alleged misrepresentation only one insider sold just 11% of his stock).

■■■ There is no question but that Caserta and Marino were corporate insiders with a fiduciary duty to refrain from materially misrepresenting Spectrum's financial condition. Given their opportunity to influence the value of Spectrum's stock by the alleged misrepresentations, and the asserted inappropriateness of their reliance defense, there are sufficient facts presented, if believed, to permit a fact-finder to conclude, drawing all reasonable inferences, that Caserta and Marino failed to publicly disclose relevant information which would have depressed the value of their stockholdings, and that they consciously capitalized on the inflated value of the stock before the losses would undoubtedly be disclosed. In sum, the fact-finder will determine whether the propitious timing by Caserta and Marino for the exercise of their options and the sales of the resultant stock was circumstantial or ill-designed.[11]

---

INS, *694 F.2d 332, 334 (5th Cir.1982) (statement made in underlying administrative proceeding constituted a judicial admission);* with Kohler v. Leslie Hindman, Inc., *80 F.3d 1181, 1185 (7th Cir.1996) ("statement made in one lawsuit cannot be a judicial admission in another");* Granzow v. Eagle Food Ctrs., Inc., *27 F.Supp.2d 1105, 1107–08 n. 4 (N.D.Ill.1998) (same);* Fuller v. King, *204 F.2d 586, 590 (6th Cir.1953) ("It is an accepted rule of evidence that, under certain conditions, statements contained in pleadings in another action, prepared by counsel employed to handle such action, are quasi-admissions, and while not conclusive are nevertheless admissible in evidence [ ].").*

**10.** In light of the asserted misrepresentations, the Section 13 claims under the Exchange Act also obviously survive.

**11.** As Caserta and Marino point out, regarding scienter, "there is currently a split in the circuit courts as to whether to make out a claim for insider trading it must be shown that a defendant actually used insider trading information in making the questioned trade, or whether it is sufficient to show that a defendant made the trade while in 'knowing possession' of insider information." Def. Mem. at 25 n 15. As they also acknowledge, the Second Circuit, although it has not yet directly confronted the issue, "has expressed

Caserta and Marino inappropriately rely upon the *Bloomberg* articles in correctly contending that "where it is evident that information has been disseminated to the market in a manner sufficient to overcome whatever omission has allegedly effected [sic] the integrity of the market, summary judgment is properly granted." Def.Mem. at 27 (citing *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1262 (4th Cir. 1993)). Indeed, in *Cooke*, the court granted defendants summary judgment as to claims that accrued after articles in the *WSJ* and *Barrons* discussed the company's poor financial health. Here, however, the *Bloomberg* articles did not state that if a different accounting had been used Spectrum would have posted losses for the relevant quarters; nor did the articles provide the particulars of the multiple contingent aspects of the fee provisions of the agreements, or disclose that the Apex Data and U.S. Robotics transactions had been prematurely reported.

 Caserta and Marino also inappropriately contend that summary judgment should be granted because the drop in the price of the stock was attributable to Sculley's resignation, rather than the restatement. In light of all the evidence that the restatement did indeed involve a material change in Spectrum's financial condition, that Sculley would not have become Spectrum's CEO if he had known its true financial condition, and that telephone calls to Spectrum after the restatement and resignation inquired about both events, it must be left to the trier of the facts to determine the cause of the stock price decline.

*SEC v. Hoover*, 903 F.Supp. 1135 (S.D.Tex.1995), principally relied upon by Caserta and Marino, does not help their cause. There, a company announced in its 10Q statement that its earnings were likely to be ten percent lower than the previous year. Nine days later, the company's general counsel learned that the earnings might be as much as twelve percent lower, and sold 15,000 shares before the lower earnings were announced. The court granted the general counsel's motion for summary judgment on the SEC's insider trading claim against him because it found that in the context of the company's overall poor performance, the prospect of a two percent difference in an estimate was not material. The present case is significantly different. The SEC financial statements were not estimates in which a weak company performed within a few percentage points of its anticipated poor performance, as in *Hoover*, but actual statements of Spectrum's financial condition which presented Spectrum as a financially successful company.

Accordingly, summary judgment cannot be granted for Caserta and Marino on the insider trading claims.

## CONCLUSION

The motion for dismissal of the sale of unregistered securities claim and the misrepresentation and insider trading claims is denied in its entirety.[12]

**SO ORDERED.**

---

a preference for the 'knowing possession' test." *Id.* (citing *dicta* in *United States v. Teicher*, 987 F.2d 112 (2d Cir.1993)). Regardless, for present purposes the facts are sufficiently controverted to support either standard.

12. Defendants' application for attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, is consequently academic.